**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA**

|  |  |  |  |
|---|---|---|---|
| 1. | MARK SCHOGGINS, PERSONAL REPRESENTATIVE of the ESTATE of MARK ANSON SCHOGGINS, Deceased, | ) ) ) ) ) | |
| | Plaintiff, | ) ) ) ) | |
| v. | | ) ) | Case No. 21-cv-133-JFH |
| 1. | STATE OF OKLAHOMA, ex rel. OKLAHOMA HIGHWAY PATROL, | ) ) ) | |
| 2. | CITY OF McALESTER, OKLAHOMA, a municipality, | ) ) | |
| 3. | GARRET GRAY, individually, | ) | |
| 4. | JAMES McKEE, individually, | ) ) | |
| | Defendants. | ) ) | |

---

**DEFENDANT CITY OF McALESTER'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

---

STEIDLEY & NEAL, PLLC

Sean M. McKelvey, OBA #17098
smm@steidley-neal.com
Meaghen E. Clark, OBA #32830
mac@steidley-neal.com
P.O. Box 1165
McAlester, OK 74502
(918) 423-4611
(918) 423-4620 – fax

*Attorneys for Defendant, City of McAlester, Oklahoma*

TABLE OF CONTENTS

I.    Introduction ................................................................................ 1

II.   Statement of Undisputed Material Facts ................................... 2

III.  Argument and Authorities ......................................................... 5

      A.   Standard of Review; Fed. R. Civ. P. 56 ....................... 5

      B.   All of Plaintiff's Claims Against the City Fail As a Matter of Law Because    7
           There is No Causal Connection Between the Actions of the City's Officer
           and Anson's Death ................................................................

      C.   There is No Summary Judgment Evidence Supporting Plaintiff's Claim    15
           That Officer Sutterfield's Actions Constitute a Constitutional Violation or
           Other Breach of a Duty That Would Support a § 1983 Claim or State Law
           Tort Claim

      D.   Plaintiff's § 1983 Claim Against the City Fails As a    22
           Matter of Law ................................................................

           1.   No Underlying Constitutional Violation For Which The City    22
                Could Be Potentially Liable ...............................................

           2.   Plaintiff Fails to Allege Any Facts, and There is No Summary    22
                Judgment Evidence, to Support Municipal Liability........................

      E.   Plaintiff's Constitutional Tort Claim Against the City Based on Bosh Fails    24
           As a Matter of Law................................................................

IV.   Conclusion ............................................................................... 25

EXHIBITS

**Exhibit 1** –  Alamo Liquor 911 Call

**Exhibit 2** –  Dispatch Call to Sutterfield

**Exhibit 3** –  Statement of Officer Sutterfield

**Exhibit 4** –  Body-worn camera video of Officer Sutterfield

**Exhibit 5** –  Dash camera video of Trooper McKee

**Exhibit 6** –  Dash camera video of Trooper Wilson

**<u>Exhibit 7</u>** – Dash camera video of Trooper Garrett Gray

**<u>Exhibit 8</u>** – Deposition of Mark Schoggins, pp. 11, 15, 17, 19, 28, 32, 33, 42, 114

**<u>Exhibit 9</u>** – Plaintiff's Response to Defendant City of McAlester's
First Set of Interrogatories to Plaintiff

TABLE OF AUTHORITIES

CASES

*Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664 (10th Cir. 1998)........................ 6

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)........................................ 6, 24

*Barney v. Pulsipher,* 143 F. 3d 1299 (10th Cir. 1998) ...................................... 23

*Barrios v. Haskell Co. Public Facilities Auth.,* 2018 OK 90............................ 25

*Beesley v. United States,* 364 F.2d 194 (10th Cir. 1966).................................. 9, 11

*Billy v. Tex., O. & E.R. Co.,* 1953 OK 280 ........................................................ 9, 11

*Board of Cty. Comm'rs v. Brown,* 520 U.S. 397 (1997)................................... 23

*Bosh v. Cherokee Cty. Gov'l Bldg. Auth.,* 2013 OK 9, superseded
    by statute as stated in *Barrios v. Haskell Co. Public Facilities
    Auth.,* 2018 OK 90 ..................................................................................... 24, 25

*Bryson v. City of Okla. City,* 627 F.3d 784 (10th Cir. 2010)............................ 23

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ................................................ 5, 6

*City of Canton v. Harris,* 489 U.S. 378 (1989)................................................. 23

*City of Okmulgee v. Hemphill,* 1938 OK 474 .................................................. 11, 12

*Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526 (10th Cir. 1994)............. 6, 24

*Connick v. Thompson,* 563 U.S. 51 (2011) ....................................................... 23

*County of Los Angeles v. Mendez,* 137 S.Ct.1539, 1548 (2017)……………… 7

*Delaware v. Prouse,* 440 U.S. 648 (1979)......................................................... 21

*Graves v. Thomas,* 450 F. 3d 1215 (10th Cir. 2006)........................................ 16

*Heck v. Humphrey,* 512 U.S. 477 (1994)........................................................... 8

*Martinez v. Carson,* 697 F. 3d 1252 (10th Cir. 2012)...................................... 8

*Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574 (1986)...................   6

*Memphis Community School Dist. v. Stachura,* 477 U.S. 299 (1986)..............   8

*Minor v. Zidell Trust,* 1980 OK 144 ....................................................   9, 10, 11

*Monell v. Department of Soc. Serv.,* 436 U.S. 658 (1978)................................   23

*Monroe v. Pape,* 365 U.S. 167,187, (1961)…………………………………..   8

*Olsen v. Layton Hills Mall,* 312 F.3d 1304 (10th Cir. 2002)............................   22

*Rasche v. Village of Beecher,* 336 F.3d 588 (7th Cir. 2003) ............................   8

*State v. Gurich,* 2010 OK 56.............................................................................   9

*State v. Nelson,* 2015 OK CR 10......................................................................   17

*Terry v. Ohio,* 392 U.S. 1  (1968) .......................................................   16,17,18,19,21

*Thompson v. Presbyterian Hosp., Inc.,* 1982 OK 87 .........................................   8, 9, 10, 11

*United States v. Arvizu,* 534 U.S. 266 (2002) ....................................................   18

*United States v. Bradford,* 423 F.3d 1149 (10th Cir. 2005).............................   16

*United States v. Gomez-Arzate,* 981 F.3d 832 (10th Cir. 2020) .......................   17

*United States v. Griffin,* 7 F.3d 1512 (10th Cir. 1993) .....................................   21

*United States v. Griggs,* 498 F.3d 1070 (9th Cir. 2007) ...................................   20

*United States v. Hensley,* 469 U.S. 221 (1985).................................................   17, 19, 20, 21

*United States v. Madrid,* 713 F.3d 1251 (10th Cir. 2013) ...............................   17, 18

*United States v. Moran,* 503 F.3d 1135 (2007).................................................   18, 19, 20, 21

*United States v. Place,* 462 U.S. 696 (1983).....................................................   16

*United States v. Torres,* 987 F.3d 893 (10th Cir. 2021)....................................   17

*Whitewater v. Goss,* 192 F. App'x. 794 (10th Cir. 2006)  ................................   23

*Willard v. Kelley,* 1990 OK 127 ...................................................................... 11

*Woodward v. Kinchen,* 1968 OK 152 ............................................................ 11, 12, 13

RULES

Fed. R. Civ. P. 56(a) .................................................................................... 5

Fed. R. Civ. P. 56(c) .................................................................................... 6


STATUTES

12 O.S. § 540A(A) ...................................................................................... 16, 17

12 O.S. § 540A(B) ...................................................................................... 16

12 O.S. § 540A(C) ...................................................................................... 16

22 O.S. § 196 .............................................................................................. 16

42 U.S.C. § 1983 ........................................................................................ passim

OKLA. CONST., art. 2, § 30 ......................................................................... 25

U.S. CONST. amend. 4 ................................................................................ 17

**DEFENDANT CITY OF McALESTER'S
MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

COMES NOW, Defendant (2) City of McAlester, Oklahoma (hereinafter "Defendant" or "the City"), by and through its attorneys of record, STEIDLEY & NEAL, P.L.L.C., and submits the following Motion for Summary Judgment, with supporting brief, pursuant to Fed. R. Civ. P. 56 and in support, show the Court as follows:

## I. INTRODUCTION

Plaintiff, the personal representative of the estate of Mark Anson Schoggins (hereafter, "Anson"), by his claims asserted in the Complaint, seeks to recover damages for the death of Anson, his son, after Anson was shot and killed by Oklahoma Highway Patrol ("OHP") troopers on July 17, 2019. Plaintiff appears to assert the following claims against the City:

1.      A state-law tort claim allegedly resulting from the attempt by Defendant City's police officer, Chuck Sutterfield ("MPD Officer Sutterfield") to make an investigatory traffic stop on Anson that Plaintiff alleges was wrongful under the Fourth Amendment and Article 2, Section 30 of the Oklahoma Constitution and proximately caused Anson's death. Petition (ECF Doc. 2-1), ¶ 3, p. 2.

2.      A claim under 42 U.S.C. § 1983, based on the Fourth Amendment, both for the attempted traffic stop and for alleged excessive force used by the OHP, with *Monell* liability against the City posited on an alleged failure to adequately train as to arrest and pursuit procedures. Petition (ECF Doc. 2-1), ¶¶ 5, 7 & 8, pp. 2-4.

3.      A *Bosh* claim, under the Oklahoma Constitution, based the same allegations as the state law tort claim and the allegation of excessive force used by the OHP. Petition (ECF Doc. 2-1), ¶¶ 3, 4 & 7, pp. 2, 3-4; s*ee also* **Exhibit 9,** Plaintiff's Response to Defendant City of McAlester's First Set of Interrogatories to Plaintiff ("Plaintiff's Interrogatory Answers"), p. 2.

As discussed below, Defendant City is entitled to summary judgment on these claims because, after adequate time for discovery, Plaintiff has failed to make a showing sufficient to establish the existence of any facts to support the requisite elements for these claims.

## II.  STATEMENT OF UNDISPUTED FACTS

1.      On July 17, 2019, McAlester Police Department ("MPD") Communications Center received a 911 call from Alamo Liquor that a white male suspect wearing a blue shirt had shoplifted two (2) bottles of vodka and fled traveling south on 6th Street in a Maroon Ford Expedition with a license number HDW 654.  **Exhibit 1**, Alamo Liquor 911 Call.

2.      Dispatch advised MPD Officer Sutterfield, who was on patrol in the area, of the theft and provided a description of the vehicle.  While traveling north on Hardy Springs Road, Officer Sutterfield observed a maroon Ford Expedition traveling south on Hardy Springs. **Exhibit 2,** Dispatch Call to Sutterfield; **Exhibit 3,** Statement of Officer Sutterfield ("Sutterfield Statement").

3.      Officer Sutterfield attempted to make an investigatory traffic stop on the SUV. **Exhibit 3**, Sutterfield Statement.

4.      As Officer Sutterfield activated his lights and sirens to initiate the traffic stop, the SUV fled. Officer Sutterfield advised dispatch he was in pursuit of the vehicle. **Exhibit 3**, Sutterfield Statement.

5.      Once the driver entered Highway 69, Officer Sutterfield observed him drinking from what appeared to be a liquor bottle. On the highway, the driver exceeded the speed limit and drove recklessly. **Exhibit 3**, Sutterfield Statement; **Exhibit 4,** Body-worn camera video of Officer Sutterfield ("Sutterfield Body Cam").

6.      As they traveled south on Highway 69, the SUV entered the northbound lanes of

2

traffic causing vehicles to move over to avoid a head-on collision with the SUV. **Exhibit 3**, Sutterfield Statement; **Exhibit 4**, Sutterfield Body Cam.

7. Dispatch informed Officer Sutterfield that additional law enforcement agencies had been notified of the pursuit, including the OHP. **Exhibit 3**, Sutterfield Statement; **Exhibit 4**, Sutterfield Body Cam.

8. Once the driver of the SUV passed under the turnpike, he attempted to enter the turnpike towards Antlers, Oklahoma. However, the driver failed to make the turn, then turned around in the center grass median. While he was turning around, Officer Sutterfield was able to observe the driver's face for the first time. Officer Sutterfield recognized him as Mark Anson Schoggins. Officer Sutterfield informed dispatch of the driver's identity and that Anson had turned around and was now heading north back towards the City of McAlester. **Exhibit 3**, Sutterfield Statement.

9. At this point, Anson drove into the south bound lanes while traveling north, driving directly at other vehicles causing them to swerve out of the way to avoid a head-on collision. One of those vehicles belonged to Defendant McKee, an OHP trooper. **Exhibit 3**, Sutterfield Statement; **Exhibit 5,** Dash camera video of Trooper McKee ("McKee Dash Cam"); **Exhibit 6,** Dash camera video of Trooper Wilson ("Wilson Dash Cam"); **Exhibit 7,** Dash camera video of Trooper Garrett Gray ("Gray Dash Cam").

10. OHP took over the chase and Officer Sutterfield advised dispatch OHP Trooper 360 (Defendant McKee) was the primary unit behind Anson. **Exhibit 3**, Sutterfield Statement; **Exhibit 4**, Sutterfield Body Cam.

11. Prior to the Business 69 Exit, OHP Trooper McKee unsuccessfully attempted a tactical vehicle intervention (TVI) on Anson's SUV. **Exhibit 3**, Sutterfield Statement; **Exhibit 5,**

McKee Dash Cam; **Exhibit 6,** Wilson Dash Cam; **Exhibit 7,** Gray Dash Cam.

12.     Anson continued north onto Business 69/Main Street traveling at approximately 110 to 115 miles per hour as he passed Swallow Street and Oklahoma Street. Traffic was congested on Main Street, and Anson and the OHP troopers following him were traveling at a high rate of speed down the center of the two-lane road causing drivers to move to the shoulder to avoid the pursuit. **Exhibit 3**, Sutterfield Statement; **Exhibit 5,** McKee Dash Cam; **Exhibit 6,** Wilson Dash Cam; **Exhibit 7,** Gray Dash Cam.

13.     Anson turned east onto South Street and Defendant Garrett Gray, another OHP trooper, attempted a second TVI. The TVI caused Anson to crash into a fence at the corner of 1st and South streets. Anson then pulled his vehicle forward and collided with OHP Trooper Gray's rear bumper.  Anson then collided with a parked car in a private driveway.  Anson then backed up and hit OHP Trooper Brad Wilson's vehicle. **Exhibit 5,** McKee Dash Cam; **Exhibit 6,** Wilson Dash Cam; **Exhibit 7,** Gray Dash Cam.

14.     All three of the OHP troopers exited their vehicles. OHP Trooper Wilson went to the driver's side of the vehicle, opened the door, and directed Anson to exit the vehicle. OHP Trooper Gray was at the front of the vehicle with his weapon drawn and pointed at Anson.  OHP Troper McKee was at the passenger side of the vehicle. **Exhibit 3**, Sutterfield Statement; **Exhibit 5,** McKee Dash Cam; **Exhibit 6,** Wilson Dash Cam; **Exhibit 7,** Gray Dash Cam.

15.     As Officer Sutterfield was exiting his vehicle to assist the OHP troopers, Anson, who refused to comply with the troopers' orders, drove towards OHP Trooper Gray. Anson's vehicle continued forward, and OHP Troopers Gray and McKee began shooting. **Exhibit 3**, Sutterfield Statement.

16.     OHP Trooper McKee and MPD Officer Sutterfield ran towards Anson's vehicle as

it rolled east, uphill toward the intersection of 3rd and South. It appeared to Officer Sutterfield that Anson was hunched over in his seat. Anson's his vehicle crashed into a yard at the corner of 3rd and South. Officer Sutterfield pulled open the driver's side door of the vehicle and found Anson hunched over, his hands not visible to the officer. Officer Sutterfield gave Anson several orders to show his hands and he did not respond. Officer Sutterfield reached out and grabbed Anson's left arm and pulled trying to get him to exit the vehicle. Anson tumbled from the vehicle to the ground. At that point, Officer Sutterfied observed that Anson had a head wound, and accordingly, he requested MPD dispatch to send an ambulance. **Exhibit 3**, Sutterfield Statement; **Exhibit 4**, Sutterfield Body Cam.

17.     McAlester Fire Department arrived and took Anson away from the scene via ambulance to the McAlester Regional Health Center. At the McAlester Regional Health Center Anson was pronounced dead due to gunshot wounds.

18.     No City officer was involved in either TVI or Anson's shooting.   **Exhibit 3**, Sutterfield Statement; **Exhibit 4**, Sutterfield Body Cam; **Exhibit 5,** McKee Dash Cam; **Exhibit 6,** Wilson Dash Cam; **Exhibit 7,** Gray Dash Cam; and **Exhibit 8,** Deposition of Mark Schoggins ("Schoggins depo."), page 42, lines 11-21.

## III.     ARGUMENT AND AUTHORITIES

### A.     Standard of Review; Fed. R. Civ. P. 56

A party may move for summary judgment on any claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is not a disfavored procedural shortcut, but an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," show that, "there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. 317, 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the non-movant. *Id.* at 248. "[I]f the evidence is merely colorable, or not significantly probative, summary judgment may be granted." *Id.* In addition, "the mere existence of a scintilla of evidence in support of a plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.* at 266.

A movant's summary judgment burden may properly be met by reference to the lack of evidence in support of a plaintiff's position. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (*citing Celotex,* 477 U.S. at 325). "Even though all doubts must be resolved in (the nonmovant's) favor, allegations alone will not defeat summary judgment." *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 530 (10th Cir. 1994) (*citing Celotex,* 477 U.S. at 324). Once the movant makes a properly supported motion, the non-movant may not rely upon mere allegations or denials in the pleadings or briefs or cast some metaphysical doubt as to the material facts. *Anderson,* 477 U.S. at 256; *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986).

**B.      All of Plaintiff's Claims Against the City Fail As a Matter of Law Because There is No Causal Connection Between the Actions of the City's Officer and Anson's Death**

Every cause of action Plaintiff asserts against the City in this case, whether founded upon § 1983 or a state-law tort, requires a showing of causation. That is, to state a cognizable claim for relief as to each of his causes of action, Plaintiff must allege specific facts which plausibly show that the City's alleged wrongful action was the "but for" proximate cause of the alleged injury. Here, Plaintiff bases causation on his theory that the initial action that put all the subsequent events into motion was Officer Sutterfield's attempt to "arrest" Anson.[1] At the outset it should be noted that the mere fact the City initiated a chain of events that may have ultimately enabled independent actors to inflict the injury is not sufficient to show that the City ***proximately*** caused that subsequent injury.[2] At most, if supported by the facts, Plaintiff might be able to recover damages resulting directly from the allegedly improper traffic stop predicated on a Fourth Amendment warrantless seizure claim, but he cannot recover damages resulting from a subsequent alleged Fourth Amendment claim based on excessive force by the OHP.[3] But as discussed below, the attempted traffic stop did not violate any law, including the Fourth Amendment. And there is no competent summary judgment evidence that suggests Plaintiff or Anson suffered any harm from the attempted traffic stop, standing alone from the events that followed thereafter.

---

[1] *See* Petition (ECF Doc. 2-1), ¶¶ 4-7, pp. 2-4; **Exhibit 9,** Plaintiff's Interrog. Answers, pp. 2-4.

[2] *See County of Los Angeles v. Mendez,* 137 S. Ct. 1539, 1548 (2017) (explaining that one Fourth Amendment claim, such as warrantless seizure, cannot be used to support a separate but related Fourth Amendment claim, such as excessive force).

[3] *Id.,* 137 S. Ct. at 1549 ("[T]he Court of Appeals' proximate cause analysis appears to have been tainted by the same errors that cause us to reject the provocation rule. . . . [T]he Court of Appeals did not identify the foreseeable risks associated with the relevant constitutional violation (the warrantless entry); nor did it explain how, on these facts, respondents' injuries were proximately caused by the warrantless entry.")

For his § 1983 claims, Plaintiff must allege facts showing a sufficient causal connection between the acts of the City and Anson's death. Section 1983 imposes liability on a government official who "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights." 42 U.S.C. § 1983. The provision "creates a species of tort liability" informed by tort principles regarding "damages and the prerequisites for their recovery." *Heck v. Humphrey,* 512 U.S. 477, 483 (1994); *accord Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306 (1986). "The requisite causal connection is satisfied if [Defendants] set in motion a series of events that [Defendants] knew or reasonably should have known would cause others to deprive [Plaintiffs] of [their] constitutional rights." *Martinez v. Carson,* 697 F. 3d 1252, 1255 (10th Cir. 2012) (internal quotation marks and citation omitted).[4] Thus, § 1983 defendants are liable only for the harm proximately caused by their conduct. *Id.*; *accord Rasche v. Village of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003). Put another way, such defendants can be held liable only if the resulting harm "would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability." *Martinez,* 697 F. 3d at 1255.

Similarly, for his claims based on a violation of Oklahoma constitutional law and common-law torts, Plaintiff is obligated to plead and prove the requisite causal nexus between the City's complained-of action and the decision of the OHP troopers to shoot Anson, including foreseeability and a lack of unforeseen intervening causes. Under Oklahoma law, there are three elements essential to a prima facie case of negligence: (a) a duty owed by the defendant to protect the plaintiff from injury, (b) a failure to properly exercise or perform that duty and (c) plaintiff's injuries proximately caused by the defendant's failure to exercise his duty of care. *Thompson v.*

---

[4] Indeed, "[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Id.* (quoting *Monroe v. Pape,* 365 U.S. 167, 187, (1961).

*Presbyterian Hosp., Inc.,* 1982 OK 87, ¶ 7. "An essential element of the plaintiff's cause of action

for negligence, or for that matter for any other tort, is that there be some reasonable connection

between the act or omission of the defendant and the damage which the plaintiff has suffered."

*State v. Gurich,* 2010 OK 56, ¶ 14 (quoting W. Page Keeton et al., PROSSER AND KEETON ON TORTS

263 (5th ed. 1984)). This reasonable connection is one of "proximate cause" or "direct cause."

*Gurich,* 2010 OK 56, ¶ 14. A direct cause is defined as follows:

> Direct cause means a cause which, in a natural and continuous sequence, produces injury
> and without which the injury would not have happened. For negligence to be a direct cause
> it is necessary that some injury to . . . a person in [Plaintiff's] situation must have been a
> reasonably foreseeable result of negligence.

*Gurich,* 2010 OK 56, ¶ 14 (quoting Oklahoma Uniform Jury Instructions (OUJI)(Civil) No. 9.6);

*see also Beesley v. United States,* 364 F.2d 194, 196 (10th Cir. 1966).[5] Proximate cause also

requires foreseeability, for the consequence of a negligent act to be foreseeable it "must be such

that a person by prudent human foresight can anticipate will likely result from the act, because it

happens so frequently from the commission of such an act that in the field of human experience it

may be expected to happen again." *Minor v. Zidell Trust,* 1980 OK 144 ¶ 8 n. 6 (internal quotations

omitted). Even if a plaintiff can establish evidence of a breach of some duty, such evidence of

breach "does not prove proximate cause, and where there is an entire failure of proof to establish

that the negligence was the proximate cause of the accident, then plaintiff has failed to make a

submissible case for the jury." *Billy v. Tex., O. & E.R. Co.,* 1953 OK 280, ¶ 16. While "the question

of proximate cause is generally one of fact for the jury," it becomes a question of law for the court

"when there is no evidence from which a jury could reasonably find a causal nexus between the

act and the injury." *Gurich,* 2010 OK 56, ¶ 14  (citations omitted).

---

[5] "In Oklahoma, "the proximate cause of an event must be that which in the natural and continuous
sequence, unbroken by any independent cause, produces that event and without which that event
would not have occurred." *Id.,* 364 F.2d at 196.

Thus, irrespective of whether the City breached any duty to Anson, the proximate cause element requires Plaintiff to demonstrate not only that the City's conduct did in fact cause Anson's death but also that his death was reasonably foreseeable from that conduct. Nothing in the summary judgment record remotely supports that MPD Officer Sutterfield's attempt to make an investigatory stop relating to a recent misdemeanor theft would, "in a natural and continuous sequence," cause Anson's death. Rather, it was Anson's unexpected and violent actions in attempting to elude police, including engaging in a high-speed, dangerous car chase and attempting to strike an OHP trooper with his vehicle, that led to his being shot to death by law enforcement officers.

Similarly, there is no summary judgment evidence to support the foreseeability of Anson's death. Under *Minor*'s rubric, Plaintiff must prove that "a person by prudent human foresight can anticipate [a fatal shooting of a person accused of a misdemeanor theft] will likely result from [an attempted investigative traffic stop of the suspect], because [a high-speed chase followed by a fatal shooting of the suspect by law enforcement officers] happens so frequently from [an attempted traffic stop of a misdemeanor suspect] that in the field of human experience [such a fatal shooting] may be expected to happen again." *See Minor,* 1980 OK 144 ¶ 8 n. 6. Based on this analysis, Anson's death was entirely unforeseeable.

Further, assuming *arguendo* that the OHP and its troopers were somehow deficient in their actions regarding Anson, such alleged deficiencies constitute a "supervening cause" of Anson's death that broke any causal link between the action by MPD Officer Sutterfield and Anson's death. "The general rule is that the causal connection between an act of negligence and an injury can be broken by the intervention of a new, independent and efficient cause which was neither anticipated nor reasonably foreseeable." *Thompson,* 1982 OK 87 ¶ 12. As a result, Officer Sutterfield's actions are—at most—a remote cause, or "mere condition" that created a condition that made Anson's death

possible, but not the proximate cause of his death. *City of Okmulgee v. Hemphill,* 1938 OK 474, ¶

4 (where the alleged conduct of a defendant "merely creates a condition by which the injury is

made possible, and a subsequent independent act of some other person causes the injury, the

defendant is not liable. This is because the negligence is not the proximate cause of the injury.");

*accord Billy,* 1953 OK 280, ¶ 16 (internal quotations omitted); *see also Beesley,* 364 F.2d at 196.[6]

This intervening factor, or "supervening cause," must meet a three-prong test to protect a party from

liability: "It must be (1) independent of the original act, (2) adequate of itself to bring about the result,

and (3) one whose occurrence was not reasonably foreseeable." *Thompson,* 1982 OK 87 ¶ 15; *accord*

*Minor,* 1980 OK 144 ¶ 7. Critical in this case is the third element for intervening cause,

foreseeability, as there is no legitimate dispute that the shooting was an act entirely independent of

Officer Sutterfield's initial attempted traffic stop or that the shooting was sufficient by itself to have

caused Anson's death. As with the proximate cause element required for prima facie negligence,

> [t]he foreseeability of the intervening force will determine whether the chain of causation
> between the defendant's negligence and the injury is to be deemed broken. . . . [I]f an
> unforeseen, unexpected and independent happening directly causes the injury, then the causal
> link between the original negligence and the resulting harm is deemed broken and the initial
> actor is thus insulated from liability.

*Willard v. Kelley,* 1990 OK 127 ¶ 22; *see also Woodward v. Kinchen,* 1968 OK 152 ¶ 12.[7]

Plaintiff's allegations in the Petition fail to illuminate the element of causation, alleging

merely in a conclusory, self-serving fashion that the McAlester Police initiated the chain of events

that ultimately led to Anson's shooting by the OHP troopers. But even if taken as true, Plaintiff's

---

[6] "Where the negligence complained of only creates a condition which thereafter reacts with a subsequent, independent, unforeseeable, distinct agency and produces an injury, the original negligence is remote rather than the proximate cause thereof. This is held to be true though injury would not have occurred except for the original act." *Id.,* 364 F.2d at 196.

[7] "[A]n injury which could not have been foreseen nor reasonably anticipated as the probable result of an act of negligence is the standard by which the existence of a condition is tested." *Id.,* 1968 OK 152 ¶ 12.

contentions alone are insufficient to establish tort liability against the City under § 1983 jurisprudence and Oklahoma law, and nothing in the summary judgment record establishes the requisite element of causation. Several Oklahoma decisions amply illustrate this conclusion:

In *City of Okmulgee,* the plaintiff attempted to avoid water that had pooled on a city street and, as a result, was struck by a passing car, who was speeding, driving without lights, and violating several city ordinances. *Id.,* 1938 OK 474, ¶ 2. The plaintiff sued the city for negligence, claiming the city was negligent in permitting the pool of water to remain on the street. *Id.,* 1938 OK 474, ¶ 3. The Oklahoma Supreme Court agreed with the city that, even if the city were negligent in allowing the water to accumulate, such negligence was not the proximate cause of the plaintiff's injury. *Id.,* 1938 OK 474, ¶ 15. The court noted that just because the existence of the water caused the plaintiff to remain on the roadway rather than immediately step onto the curb, such fact did not inexorably lead to the plaintiff's injuries, as many other scenarios were just as likely. *Id.,* 1938 OK 474, ¶ 6. The court observed that for the existence of the water to be a proximate cause or concurrent cause of the plaintiff's injuries, it must be bound together somehow with the negligent actions of the driver. *Id.* But that simply was not the case: "If the water had not been in the street, in the instant case, the plaintiff would not have been struck, but, at the same time, it cannot be said that the water actually was a concurring cause of the injury itself. It merely was an agency, a condition, which caused him to be at the place where he was when he was hit." *Id.,* 1938 OK 474, ¶ 14.

In *Woodward v. Kinchen,* the plaintiff, a passenger in the front seat of a car driven by Kinchen, was injured when Kinchen's car was struck by a car driven by Brazile, who was backing up toward Kinchen's car at a high rate of speed. *Id.*, 1968 OK 152 ¶ 5. At the time of the accident, Kinchen's car was stopped on the road beside another car facing in the opposite direction, and

Kinchen was engaged in conversation with the other driver. *Id.* The plaintiff sued Kinchen, alleging that he was negligent for not paying attention and conversing with the other driver and that his actions and those of Brazile were the combined and concurrent cause of her injuries. *Id.* The court held that Kinchen's actions were not the proximate cause of the plaintiff's injuries. *Id.,* 1968 OK 152 ¶ 18. The court first observed that "[u]nder the circumstances, it is obvious that if Kinchen had not stopped but had proceeded on, the collision would not have occurred and plaintiff would not have been injured. However, the law requires that the injuries of plaintiff result directly and proximately from the negligence of the defendant Kinchen." *Id.,* 1968 OK 152 ¶ 10. While Kinchen may have been negligent in stopping his car on the roadway, Kinchen's negligence "merely furnished a condition by which the injury was possible, and the subsequent independent acts of Brazile caused the injury." *Id.,* 1968 OK 152 ¶ 14. Moreover, "the injury could not have been foreseen nor reasonably anticipated as the probable result of Kinchen stopping his car in the street." *Id.,* 1968 OK 152 ¶ 15.

For purposes of his claim of illegal seizure, Plaintiff alleges that the crime Anson was accused of was "petit larceny," a misdemeanor under Oklahoma law, and but for MPD Officer Sutterfield's attempt to stop Anson, Anson's death would not have occurred.[8] The nature of Anson's alleged crime as a misdemeanor, while not determinative of the lawful nature of the attempted stop, leads overwhelmingly to the conclusion that Anson's violent death at the end of a dangerous high-speed car chase was ***not*** the reasonably foreseeable result of the attempted traffic stop. Even if one accepts as true that an attempted traffic stop ***might*** lead a suspect to try to elude arrest and flee, and that a dangerous, high-speed chase ***might*** ensue (highly dubious in the usual case of misdemeanor suspect), it does not follow that the ***only*** foreseeable result of the attempted

---

[8] *See* Response to Motion to Dismiss by Defendant City of McAlester (ECF Doc. 14), pp. 2, 4; Petition (ECF Doc. 2-1), ¶ 4, p. 2; ¶ 6, p. 3; ¶ 7, pp. 3-4.

traffic stop would have been the death of the suspect by fatal gunfire from law enforcement officers.  It could be said with equal logic that, when confronted by the fact that his automobile was blocked in by the vehicles of pursuing law enforcement officers, a suspect in Anson's position, a mere "misdemeanant"[9]  accused only of stealing a bottle or two of vodka, would have surrendered rather than risk yet more serious criminal charges, or even serious injury or death, by making further attempts to flee.[10] Even Plaintiff agrees that, had Anson stopped, his death would not have occurred, and that the decisions to run and drive recklessly on Highway 69 by heading into oncoming traffic, were Anson's and Anson's alone.[11]

Moreover, from the perspective of a reasonable police officer in the position of Officer Sutterfield, who knew only that the person he was attempting to stop was accused of a minor crime, it simply was not reasonably foreseeable that the suspect would (1) attempt to evade the traffic stop in the first instance; (2) engage in a highly dangerous high-speed chase to evade detention for such a minor crime; and perhaps most importantly, (3) continue his attempts to evade detention to the point of ramming his vehicle into those of pursuing law enforcement officers, then present a deadly threat to those officers by driving forward toward them. MPD Officer Sutterfield's

---

[9] *See* Petition (ECF Doc. 2-1), ¶ 6, p. 3.

[10] It is also possible that Anson's unfortunate death might otherwise have occurred absent the traffic stop. This event was not Anson's first run-in with law enforcement, *see generally,* **Exhibit 8,** Schoggins depo., p. 11, line 20 – p. 28, line 4, or even his first time he had run from law enforcement. *See id.,* p. 32, lines 19-24. Among other things, Anson has previously stolen merchandise from stores. *Id.,* p. 17, lines 12-16; p. 19, lines 10-18. As Plaintiff acknowledges, Anson had a drinking problem, *id.,* p. 15, lines 14-15, and when he was drinking he would do dumb things like run from the police. *Id.,* p. 32, line 25 - p. 33, line 3. Moreover, based on Anson's erratic and dangerous actions, culminating in his violent reaction to the OHP troopers' attempts to detain him, including intentionally colliding his vehicle with one of theirs and accelerating his vehicle directly towards an OHP trooper standing in front of his vehicle, it could be concluded with equal logic that Anson might very well have had some kind of encounter with law enforcement on the same day of his alleged larceny that, given his apparent state of mind based on his actions, would have led to a deadly conclusion.

[11] *See* **Exhibit 8,** Schoggins depo., p. 114, lines 4-18.

attempted traffic stop was not, as a matter of law, the "but for" proximate cause of Anson's decision to flee and attempt to evade law enforcement. Nor was it the "but for" proximate cause of the decision of the OHP troopers, who the City could not control, to shoot Anson at the end of the high-speed vehicular pursuit. As a matter of law, there is no genuine issue that Anson's actions and the resulting OHP use of deadly force collectively constitute a supervening force that were the "but for" cause of Anson's death, which was entirely separate from Officer Sutterfield's traffic stop, and which were not reasonably foreseeable consequences of that stop, thereby rendering the attempted traffic stop merely a condition by which the injury was possible, and not a concurrent cause of Anson's death.

Given the lack of foreseeability in this case, and the existence of supervening causes that directly led to Anson's death, there simply is no evidence from which a jury could reasonably find a causal nexus between the act and the injury. Accordingly, the question of causation in this case is a question, not of fact, but of law for the Court to determine, and the City is entitled to judgment as a matter of law on Plaintiff's § 1983 and state-law tort claims.

**C.    There is No Summary Judgment Evidence Supporting Plaintiff's Claim That Officer Sutterfield's Actions Constitute a Constitutional Violation or Other Breach of a Duty That Would Support a § 1983 Claim or State Law Tort Claim**

As discussed above, Plaintiff asserts that the initial action that put all subsequent events into motion was MPD Officer Sutterfield's allegedly unlawful attempt to "arrest" Anson. *See* Petition (ECF Doc. 2-1), ¶¶ 4-7, pp. 2-4. Plaintiff posits that the initial attempted traffic stop, which Plaintiff erroneously calls an "arrest," was wrongful solely because, Plaintiff claims, it was not authorized under Oklahoma law. *See* Petition (ECF Doc. 2-1), ¶ 4, p. 2.[12] First, the summary

---

[12] "[T]he statutes of the State of Oklahoma [provide] that an officer can not [sic] arrest a person for a misdemeanor not committed in his presence, except for some Driving under the Influence and Domestic Assault and Battery charges." *Id.*

judgment evidence makes clear that Officer Sutterfield did not arrest or attempt to arrest Anson, because, during the initial traffic stop, Anson decided to flee. Rather, Officer Sutterfield was attempting to make a traffic stop, which only *might* have led to an attempted arrest.[13] This distinction is relevant here because a "traffic stop is not equivalent to an arrest." *Graves v. Thomas,* 450 F. 3d 1215, 1223 (10th Cir. 2006).[14] Unlike arrests, which must be based on probable cause, the Fourth Amendment permits police officers who suspect criminal activity to make limited intrusions on an individual's personal security, such as an investigatory detention, based on less than probable cause. *United States v. Place,* 462 U.S. 696, 702 (1983) (citation omitted).

MPD Officer Sutterfield's decision to make a traffic stop, based on reasonable suspicion, was not improper under Oklahoma law, and thus cannot support any Fourth Amendment or state-law tort claim. Plaintiff cites 22 O.S. § 196, which provides limits on circumstances under which a peace officer can make a warrantless arrest for, among other things, a misdemeanor.[15] But as

---

[13] In fact, Plaintiff appears to acknowledge in his discovery responses that his initial characterization of Officer Sutterfield's actions as an attempt at "arrest" was erroneous, and that in fact, his actions were an attempt at a traffic stop, as he refers to Officer Sutterfield's actions through his interrogatory answers as a "stop" or "traffic stop." *See* **Exhibit 9,** Plaintiff's Interrog. Answers, answers to Interrog. Nos. 2, 5, 6(B) & 15, pp. 2-6.

[14] *See also United States v. Bradford,* 423 F.3d 1149, 1156 (10th Cir. 2005) (While "[a] traffic stop is a 'seizure' within the meaning of the Fourth Amendment, . . . [w]e have held that a routine traffic stop is more analogous to an investigative detention than a custodial arrest. We therefore analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)") (internal quotations and citations omitted). *Id.,* 423 F.3d at 1156.

[15] Plaintiff alleges that the stop was improper because it was based on a misdemeanor violation "not committed in the officer's presence." *See* Petitition (ECF Doc. 2-1), ¶ 6, p. 3; **Exhibit 9,** Plaintiff's Interrog. Answers, answer to Interrog. No. 6(B), p. 4. It should be noted that Anson's actions in failing to stop and beginning to run constituted a misdemeanor that occurred in Officer Sutterfield's presence. *See* 12 O.S. § 540A(A) (operator of motor vehicle who eludes or attempts to elude is guilty of a misdemeanor).When Anson began to speed on Highway 69 and headed into oncoming traffic, he committed a felony in Officer Sutterfield's presence. *See id.,* § 540A(B), (C) (eluding in a manner as to endanger others or that causes an accident is a felony).

discussed above, Officer Sutterfield attempted to effectuate an investigatory detention, not an arrest.[16] Under Oklahoma law, a person has a duty to submit to a traffic stop, and not flee or evade the law enforcement officer, even if there was no reasonable suspicion for the stop. *State v. Nelson,* 2015 OK CR 10, ¶ 28 ("[W]hile a person in Oklahoma may reasonably resist an unlawful arrest, the circumstances in the instant case involve an unlawful traffic stop - not an arrest"; "we decline to recognize a right to resist an unlawful traffic stop in Oklahoma. Balancing the State's interest in discouraging violence against the brief seizure typical to a traffic stop, this ruling does not result in a deprivation of liberty."); *see also* 12 O.S. § 540A(A).[17]

Likewise, under the Fourth Amendment, Officer Sutterfield's attempted traffic stop was not unlawful. The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. 4; *United States v. Torres,* 987 F.3d 893, 901 (10th Cir. 2021); *United States v. Gomez-Arzate,* 981 F.3d 832, 838 (10th Cir. 2020). "[S]topping a car and detaining its occupants [for investigatory purposes] constitute[s] a seizure within the meaning of the Fourth Amendment." *United States v. Hensley,* 469 U.S. 221, 226 (1985). In *Terry v. Ohio,* the Supreme Court established a two-pronged test to determine the reasonableness of investigatory detentions: (1) it must be "justified at its inception," and (2) the officer's action must be reasonable related in scope to the circumstances which justified the interference in the first place. *Terry v. Ohio,* 392 U.S. 1, 19-20 (1968); *United States v. Madrid,* 713 F.3d 1251, 1255-56 (10th Cir. 2013). Under

---

[16] Even if Officer Sutterfield's action could be deemed an attempted arrest (which it cannot), Plaintiff ignores the application of additional Oklahoma statutory law, which clearly would have authorized Anson's arrest: "Any peace officer may arrest without warrant any person he has probable cause for believing has committed larceny of merchandise held for sale in retail or wholesale establishments, when such arrest is made in a reasonable manner." 22 O.S. § 1342.

[17] Under § 540A(A), an operator of motor vehicle who has received a visual and audible signal from a peace officer and then eludes or attempts to elude a police officer is guilty of a misdemeanor.

*Terry* and its progeny, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Madrid,* 713 F.2d at 1256 (citation omitted). "An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *Id.* (internal quotation marks omitted). "[A]n officer with reasonable suspicion need not 'rule out the possibility of innocent conduct' as long as the totality of the circumstances suffices to form 'a particularized and objective basis'" for a stop. *United States v. Moran,* 503 F.3d 1135, 1140 (2007) (quoting *United States v. Arvizu,* 534 U.S. 266, 277-78 (2002)).

Police officers must have more than a "hunch" to justify stopping an individual, but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu,* 534 U.S. at 274. "[A]s long as [the detaining officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Madrid,* 713 F.3d at 1256 (citation omitted). The court must apply an objective standard to determine whether the "facts available to the officer at the moment of the seizure or the search [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* (quoting *Terry,* 392 U.S. at 22 (internal quotation marks omitted)). Due to their "experience and specialized training," the court must "accord deference to an officer's ability to distinguish between innocent and suspicious actions." *Id.* (citation omitted). "Moreover, reasonable suspicion may be supported by an

objectively reasonable good faith belief even if premised on factual error." *Id.* (citation and internal quotation marks omitted).

Once reasonable suspicion is established, the court must determine if the traffic stop was otherwise constitutional. The U.S. Supreme Court presented a balancing test to determine the constitutionality of an investigatory stop by balancing "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley,* 469 U.S. at 226; *accord Moran,* 503 F.3d at 1141. The Supreme Court's ruling in *Terry* and subsequent cases, while involving imminent or ongoing crimes, was not expressly temporally limited, and those opinions also apply to instances of completed crimes. *Hensley,* 469 U.S. at 227, 228. Whether the crime at issue is imminent, ongoing, or completed, the constitutional validity of an investigatory stop is measured by the same intrusion versus governmental interest balancing test recognized by *Terry* and its progeny. *Id.,* 469 U.S. at 228. Also, in the Tenth Circuit, the *Terry* and *Hensley* tests are not limited to felonies; rather, those tests may be applied in cases of misdemeanors, with the determination of a Fourth Amendment violation to be made on a case-by-case basis. *Moran,* 503 F.3d at 1141, 1143.

While "the governmental interest in crime prevention and detection, necessarily implicated in a stop to investigate ongoing or eminent criminal conduct, may not be present when officers are investigating past criminal conduct," "[a] stop to indicate past criminal activity may, however, serve the governmental interest in 'solving crimes and bringing outfit offenders to justice.'" *Moran,* 503 F.3d at 1142 (quoting *Hensley,* 469 U.S. at 229). This interest in solving crimes is strong when "the criminal activity involves a threat to public safety." *Id.* An element supporting a threat to public safety is whether the underlying crime involves some risk of confrontation between the subject and the owner of property in question. *Moran,* 503 F.3d at 1142. Clearly, the crime of

shoplifting, as in this case, can potentially involve some risk of confrontation between the suspect and shoplifter and the employees of the shop owner.

Another element supporting a threat to public safety is "the likelihood that the alleged criminal activity would recur." *Moran,* 503 F.3d at 1142. Indeed, "law enforcement interest is stronger when intervention of [an] 'investigating officer might eliminate any ongoing risk that an offending party might repeat the completed misdemeanor or . . . might stem the potential for escalating violence arising from such conduct.' " *Id.* (quoting *United States v. Griggs,* 498 F.3d 1070, 1081 (9th Cir. 2007)). Here, rather than conceal the liquor bottles on his person and sneak them out of the liquor store, it is apparent that Anson stole the vodka in the presence and view of store employees since the employees were able to give the 911 operator a description of the suspect and the vehicle he was driving. Based on the brazen nature of his theft, it is reasonable for an officer in the position of Officer Sutterfield to conclude that the suspect might have repeated the completed misdemeanor or that an investigatory detention might otherwise stem the potential for violence that might arise from possible confrontation due to such conduct.

Finally, while "the governmental interest in solving crime may be weaker when police have alternative methods of investigating the crime," e.g., if the suspect is known to the police at the time of the traffic stop and could be located later at his home, where the suspect had allegedly committed the crime only shortly before officers attempted to stop him, "the governmental interest in solving the crime [is] strong." *Moran,* 503 F.3d at 1142. "To restrain police action in such a situation would be to require police to turn their backs on potential criminal activity and to 'enable the suspect to flee.'" *Id.* (quoting *Hensley,* 469 U.S. at 229). Here, Officer Sutterfield initiated the traffic stop of Anson within minutes of the alleged crime. Thus, like the suspect in *Moran* who was stopped within minutes of his alleged criminal trespass, Anson "more nearly represented an

20

individual in the process of violating the law or a suspect fleeing from the scene of a crime than 'a suspect in a past crime who now appears to be going about his lawful business. . . .'" *Moran,* 503 F.3d at 1142 (quoting *Hensley,* 469 U.S. at 228). In addition, at the time he initiated the traffic stop and later commenced pursuit, Officer Sutterfield did not know the identity of the suspect he was attempting to stop. Under such circumstances, where the suspect is not known to law enforcement, and when the immediate past criminal activity suggests an ongoing threat to public safety, "a stop may further a strong governmental interest in solving crime." *Id.*

After evaluation of the governmental interest, the court must consider the nature of the intrusion. *See Moran,* 503 F.3d at 1143. An investigatory stop is by definition "brief" and "non-intrusive" *Id.; see also Delaware v. Prouse,* 440 U.S. 648, 653 (1979) (noting investigatory stop of an automobile "is limited [in purpose] and the resulting detention quite brief); *United States v. Griffin,* 7 F.3d 1512, 1516 (10th Cir. 1993) (explaining a *Terry* stop is "usually characterized as a brief, nonintrusive detention during a frisk for weapons or preliminary questioning."). Thus, by definition, Officer Sutterfield's traffic stop, had it occurred, would have been a minor intrusion on Anson's Fourth Amendment rights.

MPD Officer Sutterfield's attempt to make the initial traffic stop was not a violation of any civil rights or other law. Because the theft had been completed minutes before Officer Sutterfield attempted the stop, the governmental interest in solving the crime was strong. To restrain police action in such a situation would be to require police to turn their backs on potential criminal activity and to enable the suspect to flee. At the time he was stopped, Anson more nearly represented an individual in the process of violating the law, or a suspect fleeing from the scene of a crime and thus the attempted traffic stop was justified. Thus, balanced against the City's strong governmental

21

interest in solving crime, the relatively limited intrusion on Anson's personal security occasioned by Officer Sutterfield's attempted investigatory stop was warranted.

**D.      Plaintiff's § 1983 Claim Against the City Fails As a Matter of Law**

Plaintiff alleges that "the City of McAlester . . . failed to properly train [its] officers in the use of force and the arrest procedures. That the failure to train and the resulting actions violated the Constitutional rights of the deceased causing an illegal seizure and excessive force nearby resulting in a loss of his life." Petition, ECF Doc. 2-1, ¶ 7, p. 4. Other than conclusory statements, Plaintiff has failed to make a showing to support his § 1983 claim against the City based municipal liability under either of these theories.

### 1.  No Underlying Constitutional Violation For Which The City Could Be Potentially Liable

There can be no municipal or organizational liability under § 1983 "when there was no underlying constitutional violation by any of its officers." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1317-18 (10th Cir. 2002) (citation omitted). As set forth above, Plaintiff has failed to establish that Officer Sutterfield's attempted traffic stop and subsequent pursuit of Anson amounts to a constitutional violation. Accordingly, there is no underlying constitutional violation made out for which the City could be potentially liable. Therefore, the City is entitled to summary judgment on Plaintiff's § 1983 claim against it for this reason alone.

### 2.  Plaintiff Fails to Allege Any Facts, and There is No Summary Judgment Evidence, to Support Municipal Liability

Even if Plaintiff had stated a claim for a constitutional violation by Officer Sutterfield, the Petition does not allege a basis for holding the City liable for it. It is well settled law that municipalities and other local governmental bodies are not subject to liability under § 1983 based on the doctrine of *respondeat superior*; or otherwise stated, these government bodies are not liable

under § 1983 merely because they employ a person who violated a plaintiff's civil rights. *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 691 (1978). To properly assert a claim for municipal liability, a plaintiff "must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010). In limited circumstances, a municipality may be liable under § 1983 for its failure to train its employees about their legal duty to avoid violating citizen's rights. *Connick v. Thompson,* 563 U.S. 51, 61 (2011). The Supreme Court has expressed that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* A municipality may only be held liable under a § 1983 claim when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Whitewater v. Goss,* 192 F. App'x. 794, 797 (10th Cir. 2006) (quoting *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989)); *accord Bryson,* 627 F.3d at 788.

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Bryson,* 627 F.3d at 789. A pattern of similar tortious conduct may establish that the municipality had notice. *Id.* "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference." *Connick,* 563 U.S. at 62. Deliberate indifference "may be found absent a pattern of unconstitutional behavior" only in "a 'narrow range of circumstances'" where "a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence of a municipality's action or inaction." *Barney v. Pulsipher,* 143 F. 3d 1299, 1307 (10th Cir. 1998) (quoting *Board of Cty. Comm'rs v. Brown,* 520 U.S. 397, 410-12 (1997)).

Here, other than conclusory statements, the Petition is devoid of factual allegations sufficient to support Plaintiff's failure-to-train claims. For example, Plaintiff does not allege any facts to support a conclusion that the City had actual or constructive notice of a need to further train its officers. Plaintiff also fails to allege any facts to establish that the City's alleged failure to train its officers amounts to a "deliberate indifference" to the rights of citizens, such as a pattern of similar constitutional violations. Plaintiff has acknowledged in his answers to interrogatories that he has *no* proof supporting his allegation of a failure to train as to use of force.[18] As for his failure-to-train based on arrest procedures, Plaintiff fares little better: Plaintiff concedes his claim here is based solely on Anson's non-exist "arrest" being unlawful—an assertion readily discredited as discussed above.[19] In fact, all of Plaintiff's "facts" asserted to support his claim of the City's liability are mere legal conclusions.[20] Plaintiff's "allegations alone will not defeat summary judgment." *Cone,* 14 F.3d at 530. And Plaintiff cannot rely on "mere allegations or denials in the pleadings or briefs or cast some metaphysical doubt as to the material facts." *Anderson,* 477 U.S. at 256.  Accordingly, because of the fatal deficiencies in Plaintiff's "failure to train" allegations, the City is entitled to judgment as a matter of law on Plaintiff's § 1983 claim.

E.    **Plaintiff's Constitutional Tort Claim Against the City Based on *Bosh* Fails As a Matter of Law**

Plaintiff attempts to assert a "*Bosh"* claim in his Petition, asserting that the City is liable to Plaintiff in tort for violation of Article 2, Section 30 of the Oklahoma Constitution, which, like its

---

[18] *See* **Exhibit 9,** Plaintiff's Interrog. Answers, answer to Interrog. No. 8, p. 4.

[19] *See id.*, answer to Interrog. No. 9, p. 5.

[20] In fact, the City has formal written policies on the use of force and pursuits, which it has produced to Plaintiff in discovery. Despite having received those policies, Plaintiff has made no attempt to amend his conclusory responses to the City's interrogatories or amend his Petition to provide facts to support his failure-to-train allegations.

verbatim counterpart, the Fourth Amendment, protects the rights of persons to "be secure in their persons . . . against unreasonable . . . seizures. . . ." OKLA. CONST., art. 2, § 30; Petition (ECF Doc. 2-1), ¶¶ 3, 4, p. 2. In support of his claim, Plaintiff relies upon *Bosh v. Cherokee Cty. Gov'l Bldg. Auth.,* 2013 OK 9, *superseded by statute as stated in Barrios v. Haskell Co. Public Facilities Auth.*, 2018 OK 90 ¶ 2. The Oklahoma Supreme Court declared in *Barrios* that, because of amendments to the Oklahoma Governmental Tort Claims Act ("GTCA") made by the Oklahoma Legislature in 2014, "'constitutional' torts are now clearly 'torts' governed by the GTCA . . ." *Barrios*, 2018 OK 90, ¶ 12. Accordingly, the City is entitled to summary judgment on Plaintiff's constitutional tort claim because *Bosh* has been superseded by statute, and Plaintiff's Article 2, Section 30 claim is fully subject to the GTCA.

## IV.   CONCLUSION

WHEREFORE, premises considered, Defendant, City of McAlester, respectfully requests, pursuant to Fed. R. Civ. P. 56, that the Court grant judgment in its favor as a matter of law on each of Plaintiff's causes of action against the City, for the reasons explained herein.

Respectfully submitted,

STEIDLEY & NEAL, P.L.L.C.
*Attorneys for Defendan City of
McAlester, Oklahoma*

By: *s/Sean M. McKelvey*
    Sean M. McKelvey, OBA #17098
    smm@steidley-neal.com
    Meaghen E. Clark, OBA #32830
    mac@steidley-neal.com
    P.O. Box 1165
    McAlester, OK 74502
    (918) 423-4611
    (918) 423-4620 - fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 12th day of December, 2022, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Gary J. James, OBA #12718
gary@garyjameslaw.com
*Attorney for Defendants Gray & McKee, individually*

Kevin McClure, OBA #12767
kevin.mcclure@oag.ok.gov
*Attorney for Defendants Gray, McKee & OHP*

Warren Gotcher
Warren@gotcher-beaver.com
*Attorney for Plaintiff*

*/s/ Sean M. McKelvey*