# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MARK SCHOGGINS, Personal** | ) | |
| **Representative of the Estate of** | ) | |
| **MARK ANSON SCHOGGINS, Deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-21-133-JFH-GLJ** |
| | ) | |
| **STATE OF OKLAHOMA, ex rel.,** | ) | |
| **OKLAHOMA HIGHWAY PATROL;** | ) | |
| **CITY OF MCALESTER, an Oklahoma** | ) | |
| **Municipality; GARRET GRAY,** | ) | |
| **Individually; and JAMES MCKEE,** | ) | |
| **Individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This case arises out of an encounter between Mark Anson Schoggins, now deceased (hereinafter, Plaintiff), and law enforcement officers from the Oklahoma Highway Patrol ("OHP") and the City of McAlester Police Department ("MPD"). Mr. Schoggins's representative is suing both OHP and the City of McAlester ("McAlester"), as well as OHP Officers Garret Gray and James McKee. The claims against the Defendants are made pursuant to 42 U.S.C. § 1983, and the Oklahoma Governmental Tort Claims Act ("OGTCA"), and the Defendants filed summary judgment motions on all claims raised. For the reasons set forth below, the Court finds that Defendants OHP, Garret Gray and James McKee's Motion for Summary Judgment [Docket No. 49] and Defendant City of McAlester's Motion for Summary Judgment and Brief in Support [Docket No. 48] should

be GRANTED.

## I. Procedural History

On April 8, 2021, Plaintiff filed the present case in Oklahoma State Court in Pittsburg County, Case No. CJ-21-048, and Defendants removed the case to this Court on May 4, 2021 [Docket Nos. 1-2]. McAlester moved to dismiss the claims against it on May 20, 2021 [Docket No. 11]. Defendants filed motions for summary judgment on December 12, 2022.[1] On February 13, 2023, the Court referred this case to the undersigned Magistrate Judge for all further proceedings in accordance with jurisdiction pursuant to 28 U.S.C. § 636 [Docket No. 61].

Plaintiff's Complaint suggests numerous causes of action, although not all remain at this stage.[2] First, Plaintiff alleges as to Defendants Gray and McKee a claim for unconstitutional use of excessive force in violation of Plaintiff's Fourth Amendment rights pursuant to 42 U.S.C. § 1983. As to both McAlester and OHP, Plaintiff alleges an Oklahoma state law tort claim, a *Bosh*[3] claim under the Oklahoma Constitution, and a claim pursuant to § 1983 for failure to train. Following McAlester's Motion for Summary

---

[1] The undersigned Magistrate notes that the Eastern District of Oklahoma has been subject to an exceptionally heavy caseload in the wake of *McGirt v. Oklahoma*, _ U.S. _, 140 S. Ct. 2452 (2020), resulting in significant delays to this Court's civil docket during that time.

[2] "At minimum, [R]ule 8(a) requires a comprehensible, short and plain statement of the claim(s) sufficient to give the opposing party reasonable and fair notice of the basis of the complaint." *Abdelsamed v. Colorado*, 6 Fed. Appx. 771, 772 (10th Cir. 2001). Although the undersigned Magistrate Judge proceeds on the substance, Counsel is cautioned that, "as a structural matter, the . . . Complaint is deficient because it purports to assert multiple claims for relief within each 'Claim for Relief.' . . . This format, which is repeated in Claims Three, Four, and Six, is improper under Rule 8 of the Federal Rules of Civil Procedure." *Park v. TD Ameritrade Tr. Co.*, 2010 WL 4608225, at *2 (D. Colo. Nov. 5, 2010).

[3] *Bosh v. Cherokee County Governmental Building Authority*, 2013 OK 9, 305 P.3d 994.

Judgment, Plaintiff acknowledges he failed to develop the *Bosh* claim and the failure-to-train theory and actively abandons them, leaving only his state law tort claim as to McAlester.  Following the motion for summary judgment submitted by Defendants Gray, McKee, and OHP, Plaintiff states that he is pursuing the § 1983 action as to Defendants Gray and McKee and only the Oklahoma state law tort claim for excessive force as to OHP.  Plaintiff's abandoned claims should be dismissed with prejudice.  *See Carney v. City & Cnty. of Denver*, 2006 WL 2884767, at *2 n.1 (D. Colo. Oct. 10, 2006) ("By her response to defendant's motion for summary judgment, plaintiff confirms that she has asserted no cause of action for hostile work environment racial harassment. She concedes also that she cannot prove a claim for violation of her rights to substantive due process under the Fourteenth Amendment, and, therefore, abandons that claim, which I will dismiss with prejudice."); *see also Khalik v. United Air Lines*, 2010 WL 5068139, at *5 (D. Colo. 2010) ("Plaintiff has conceded that her complaint fails to state a claim for breach of contract or promissory estoppel. . . . In light of Plaintiff's concession, these claims should be dismissed with prejudice.").  The undersigned Magistrate Judge now addresses the remaining claims in turn.

## II. Law Applicable

Summary judgment is appropriate if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The moving party must show

the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  However, "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute[.]"  Fed. R. Civ. P. 56(c).

## III. Factual Background

The undisputed facts reflect that an employee from Alamo Liquor in McAlester, Oklahoma called 911 to report a male suspect had shoplifted a bottle of vodka and fled the premises in his Ford Expedition ("SUV").  Docket Nos. 48, p. 8, ¶ 1 & Ex. 1; Docket No. 49, p. 14, ¶ 17 & Ex. 9, Bates 262 & 264.  MPD Officer Chuck Sutterfield responded to the call after observing the SUV passing through his patrol area and confirming the observed SUV's license plate matched the one called in. Docket No. 48, p. 2, ¶ 2. Sutterfield attempted to make an investigatory traffic stop by activating his lights and sirens in a parking lot where the SUV pulled over.  *Id.*, ¶¶ 3-4.  The driver of the SUV, Plaintiff, then accelerated through the parking lot and proceeded to Highway 69, driving Southbound, while Sutterfield notified dispatch of the pursuit.  *Id.*, ¶¶ 3-5 & Ex. 3. Sutterfield observed Plaintiff drinking from what appeared to be a liquor bottle, driving well in excess of the speed limit, and swerving into the Northbound lanes while still driving Southbound, which caused many vehicles to move over to avoid collisions.  *Id.*, pp. 8-9, ¶¶ 5-7.  Plaintiff reached the entrance to the Indian Nation Turnpike, but missed it, went off the roadway, and swerved, before turning his vehicle North in the Northbound

lanes of Highway 69 in the direction of McAlester. *Id.*, p. 9, ¶¶ 8-9. As Plaintiff turned the SUV around, Sutterfield recognized Plaintiff and identified him to dispatch (they had worked together in high school). *Id.*, Ex. 3. During the pursuit, Sutterfield was joined by law enforcement officers from MPD and OHP, including vehicles each driven by OHP Troopers Garret Gray, James McKee, Keith Robertson, and Brad Wilson. *Id*, p. 9, ¶¶ 7, 9-10.

While driving north on Highway 69, Plaintiff swerved into the Southbound lanes, causing vehicles again to pull over to avoid colliding with him, including OHP Trooper McKee. Docket No. 48, p. 9, ¶ 9; Ex. 5 (McKee Dash Cam), 1:50-2:03.[4] During this time, OHP took over the chase and Trooper McKee's vehicle became the first unit behind Plaintiff. *Id.*, ¶ 10 & Ex. 5, 1:56. Still on Highway 69, McKee made the first attempt at a Tactical Vehicle Intervention ("TVI") by intentionally colliding with the rear bumper of the SUV. *Id.*, ¶ 11 & Ex. 5, 2:50-3:08; Ex. 6 (Wilson Dash Cam), 4:45-5:01. Plaintiff's SUV swerved but he regained control and continued Northbound until he reached Business 69/Main Street. His estimated speed reached 100 to 115 miles per hour even after exiting Highway 69, and dash cam footage reveals numerous vehicles pulled off to the side of the road to avoid collisions and to make way for law enforcement officers. *Id.*, ¶¶ 11-12 & Ex. 5, 00:20-4:55; Ex. 6, 2:15-6:47.

Plaintiff then made a right-hand turn going east onto South Street, immediately

---

[4] All dash cam citations are given to the timestamps found in the exhibits rather than am/pm clock time for ease of reference and to avoid any time discrepancies due to syncing (or lack thereof) over the numerous devices.

followed by OHP Trooper Gray, who attempted a second TVI.  Docket No. 48, p. 10, ¶ 13; Ex. 6 6:47-7:18; & Ex. 7 (Gray Dash Cam), 4:54-5:08.  Following this collision, Gray's vehicle passed Plaintiff's on the right-hand side while Plaintiff spun into a fence on the left, then attempted to continue eastbound.  *Id.*, Ex. 6, 6:50-6:59.  Gray placed his vehicle in reverse and the rear of Plaintiff's SUV collided with Gray's rear bumper, causing it to fall off into the street.  *Id.*, Ex. 5, 4:56-5:04; Ex. 7, 5:08-5:15; Docket No. 49, Ex. 9, Bates 269, 9:40-9:45.  This collision sent the SUV veering to the left into a vehicle parked in a nearby driveway.  Docket No. 48, Ex. 6, 6:57-7:01.  Plaintiff then placed the SUV in reverse to clear the parked vehicle and, as he backed up, hit Trooper Wilson's vehicle which had arrived on scene and was parked to the left of Gray's, directly behind the SUV as it reversed.  Docket No. 49, Ex. 9, Bates 267, 9:26-9:40.  The SUV continued with slow forward movement.  Docket No. 48, p. 10, ¶ 13 & Ex. 6, 7:01-7:08; Docket No. 49, Ex. 9, Bates 267, 9:40-9:45.  Over five minutes had passed by this point.  Docket No. 48, Ex. 5, 00:00-5:15.

Wilson got out of his vehicle and ran up to the driver's side of the SUV as it started the slow forward movement, near the driveway of the impacted parked car.  Docket No. 48, p. 10, ¶ 14 & Ex. 6, 7:04-7:08.  Wilson opened the door and instructed Plaintiff to get out of the SUV.  *Id.*, Ex. 6, 7:04-7:10.  As that was happening, first Gray and then McKee approached the SUV from the passenger side.  Gray continued to the front of the SUV while McKee remained on the passenger side. This movement resulted in Wilson being on the SUV driver's side, Gray in front of the SUV, and McKee on the passenger side.  *Id.*, Ex. 5 (McKee Dash Cam) 5:14-5:18.  Plaintiff continued to disregard Wilson's

-6-

instructions and continued moving forward in Trooper Gray's direction. *Id.*, Ex. 6, 7:10-7:11. As the SUV moved forward, Gray and McKee began shooting, and the shooting lasted approximately six to eight seconds. *Id.*, Ex. 4, 6:00-6:06; Ex. 5, 5:18-5:22; Ex. 6, 7:08-7:16; Docket No. 49, Ex. 9, Bates 268, 5:58-6:04 & Bates 269, 9:57-10:04. While shooting, Gray moved from the front of the vehicle to the driver's side, and stopped shooting once the vehicle passed him; McKee kept shooting as the vehicle continued to move away from the officers. *Id.*, Ex. 6, 7:11-7:14. Wilson, who had been shot, remained in the driveway while MPD Officer Sutterfield and others, with guns drawn, followed the car down the block where it rolled to a stop, partially in a yard and partially in the intersection of 3rd and South. *Id.*, Ex. 4 (Sutterfield Body Cam), 5:58-6:21; Ex. 6, 7:12-7:18. Officers opened the door and Sutterfield instructed Plaintiff to show his hands, but he did not respond. Another officer grabbed Plaintiff's left arm, at which time his body tumbled to the ground and it was clear he was deceased. Docket No. 48, pp. 10-11, ¶¶ 16 & Ex. 4, 6:21-6:40; Docket No. 49, Ex. 9, Bates 268, 6:24-6:27. Sutterfield requested an ambulance, and Plaintiff's body remained on the ground until it arrived. Docket No. 48, p. 11, ¶ 16; Ex. 4, 6:41-7:15; Docket No. 49, Ex. 9, Bates 271, 6:24-10:00. Plaintiff was pronounced dead due to gunshot wounds upon his transport to and arrival at McAlester Regional Health Center. Docket No. 48, p. 11, ¶ 17. No MPD officer executed a TVI or shot their weapons. Each TVI was conducted by an OHP Trooper, and only OHP Troopers Gray and McKee fired their weapons. *Id.*, ¶ 18.

## Analysis

The Defendants all move for summary judgment. Defendants Gray and McKee

assert that they are entitled to qualified immunity.  OHP asserts that it is exempt from the claim against it pursuant to the OGTCA or, alternatively, that State law enforcement officers did not violate the constitution and owed no duty to Plaintiff.  McAlester contends that there is no causal connection between Officer Sutterfield's actions and Plaintiff's death, and thus no evidentiary support for a state law tort claim.  Plaintiff challenges all these arguments, first contending that Defendants Gray and McKee were not justified in using deadly force, and that the issue of excessive force under the Oklahoma constitution is fact intensive, and therefore not appropriate for summary judgment as to OHP. Additionally, he contends there was no intervening cause relieving McAlester from liability.  For the reasons set forth below, the undersigned Magistrate Judge finds that the summary judgment motions should be granted and Defendants Gray and McKee should be granted qualified immunity.

## A.  § 1983 Excessive Force as to Gray & McKee

The first issue is whether Defendants Gray and McKee are entitled to qualified immunity on Plaintiff's excessive force claim.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010) (*quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Additional steps are taken when a summary judgment motion raises a defense of qualified immunity." *Cunningham v. New Mexico*, 2014 WL 12791236, at *4 (D. N.M. May 12, 2014) (*citing Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

-8-

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right *and* (2) the constitutional right was clearly established. The court may consider either of these prongs before the other 'in light of the circumstances in the particular case at hand.'" *Cunningham*, 2014 WL 12791236, at *4 (emphasis added) (*quoting Pearson*, 555 U.S. at 236). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *White v. Pauly*, 580 U.S. 73, 79 (2017) (*quoting Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment— showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Rojas v. Anderson*, 727 F.3d 1000, 1003 (10th Cir. 2013) (quotation omitted).

In most qualified immunity cases with multiple defendants, "[p]laintiffs must do more than show that their rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible for those violations. They must identify specific actions taken by particular defendants[] that violated their clearly established constitutional rights." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) (internal citations omitted); *see also Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011) ("§ 1983 imposes liability for a defendant's own actions—personal participation in the specific constitutional violation complained of is essential."). Put another way, "the complaint must 'isolate the allegedly unconstitutional acts of each defendant'; otherwise the complaint does not 'provide adequate notice as to the nature of the claims against each'

and fails for this reason." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 (10th Cir. 2018)

(*quoting Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008)).   One exception to

this rule, though, is sometimes found at the summary judgment stage of excessive force

cases where there is active and joint participation in the use of force.[5]  *See Estate of Booker*

*v. Gomez*, 745 F.3d 405, 421 (10th Cir. 2014) ("Although we frequently conduct separate

qualified immunity analyses for different defendants, we have not always done so at the

summary judgment stage of excessive force cases.   Where appropriate, we have

aggregated officer conduct.") (collecting cases).   When Defendants appear to have

engaged in a "group effort," the Tenth Circuit permits, but does not require, an aggregate

analysis.  *See, e. g.*, *Stout v. United States*, 2016 WL 4130231, at *2 (W.D. Okla. Aug. 2,

2016) ("Given that all of the individual Defendants are alleged to have fired into the car,

it is not necessary to determine which of the officers fired the shot that resulted in Stout's

death."); *see also Estate of Booker*, 745 F.3d at 422 ("Because the Defendants here

engaged in a group effort, a reasonable jury could find them liable for an underlying

finding of excessive force.").  *Cf. Lynch v. Board of County Commissioners of Muskogee*

*County, Oklahoma*, 786 Fed. Appx. 774,783 (10th Cir. 2019) ("Because we address each

---

[5] The Tenth Circuit also noted in *Estate of Booker v. Gomez* that "failure to conduct an individualized analysis is [also] not reversible error" where an individual's actions do not constitute excessive force but the "deputy could be liable under a failure-to-intervene theory." 745 F.3d at 421-422. However, Plaintiff neither alleges in the Complaint that Gray and/or McKee failed to intervene nor makes such argument in his Response, and the Court will therefore not consider this alternative to the active and joint participation of the two named Defendants. *Lynch v. Board of Cty. Commissioners of Muskogee County, Oklahoma*, 786 Fed. Appx. 774,781 n.3 (10th Cir. 2019) ("A plaintiff does not have to separately plead a failure to intervene cause of action, but the pleadings must make clear the grounds on which the plaintiff is entitled to relief. Here, the pleadings did not make clear that the appellants are entitled to relief on a failure to intervene theory.") (internal quotations omitted).

officer separately, we need not opine as to whether group-analysis would have been appropriate."). Group analysis is thus often accompanied by either an indivisible activity such as all officers firing weapons at the same time (as discussed in *Stout*, above), or when each officer's active participation is nevertheless also made part of the analysis. *See Moore v. Stadium Management Company, LLC*, 2016 WL 879829, at *8 (D. Colo. March 8, 2016) (citing to *Estate of Booker* and noting that, "in finding that aggregating the conduct of multiple officers was appropriate, the Tenth Circuit's decision cited evidence of each officer's active participation in the challenged use of force."). Here, the aggregate analysis applies because both Gray and McKee fired into the truck at the same time, resulting in active and joint participation, and no party has made arguments addressing them separately.

**Violation of a Constitutional Right.** "To state an excessive force claim 'under the Fourth Amendment, plaintiffs must show *both* that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Thomas v. Durastanti*, 607 F.3d 655, 663 (10th Cir. 2010) (emphasis in original) (*quoting Childress v. City of Arapaho*, 210 F.3d 1154, 1156 (10th Cir. 2000)). "[T]he application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." *Torres v. Madrid*, _ U.S. _, 141 S. Ct. 989, 1003 (2021). The parties do not challenge that a seizure occurred, as the Defendants were in the process of apprehending Plaintiff when they shot him.

With the seizure accepted, it remains for the Plaintiff to demonstrate that the shooting was unreasonable. "A claim that law-enforcement officers used excessive force

to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). And it is an objective inquiry: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotations omitted). An officer does not have to use the least intrusive means, as long as his conduct was reasonable, based on the totality of the circumstances. *Thomas*, 607 F.3d at 670; *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Because it is based on the totality of circumstances of each case, "[r]easonableness" does not have a precise test but rather "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004) (*quoting Saucier v. Katz*, 533 U.S. 194, 205 (2001)). "[W]e are mindful: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (*quoting Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009)). Furthermore, "[t]he use of deadly force is considered reasonable 'only if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others.'" *Ortiz v. Mora*, 426 F. Supp. 3d 924, 934 (D.N.M. 2019) (emphasis in original) (*quoting*

-12-

*Thomson v. Salt Lake City*, 584 F.3d 1304, 1313) (10th Cir. 2009) ("Deadly force is such force that create[s] a substantial risk of causing death or serious bodily harm.") (*quoting Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

The Supreme Court in *Graham* set out several important factors to test reasonableness under the Fourth Amendment, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  490 U.S. at 396.  In making this reasonableness analysis, we also consider "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force," *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (internal citation and quotation omitted), as well as "whether the officers were in danger at the *precise moment* that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force[,]" *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995) (emphasis added). Finally, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.

As an initial matter, the undersigned Magistrate Judge finds that the first and third *Graham* factors, the severity of the crime and whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight, both weigh in favor of Defendants.  Alamo Liquor employees called to report that Plaintiff had stolen a bottle of vodka, which is a misdemeanor under Oklahoma law.  21 Okla. Stat. § 1731(A).  For this first factor,

"[f]elonies are deemed more severe." *Clark v. Bowcutt*, 675 Fed. Appx. 799, 807 (10th Cir. 2017). However, Plaintiff was never stopped for this offense and instead was fleeing from officers from the beginning of the encounter. The manner in which he fled is classified as both a felony and a violent crime under Oklahoma law. 21 Okla. Stat. § 540A (eluding police officer "in such manner as to endanger any other person" deemed a felony) & 57 Okla. Stat. § 571(zz) (eluding a peace officer is a violent crime). Moreover, Plaintiff's method of evading the police clearly placed other motorists and law enforcement officers in danger. The severity of the crime is thus weighed in Defendants' favor. *Cf. Navarro v. New Mexico Dep't of Pub. Safety*, 2018 WL 4148452, at *6 (D.N.M. Aug. 30, 2018) ("Law enforcement initiated the stop because they were aware Mr. Navarro allegedly committed two first degree, violent felonies: armed robbery and aggravated battery. Moreover, once Mr. Navarro decided to flee from a lawful traffic stop, he committed the additional felony of aggravated fleeing and reckless driving.") (citations omitted) (collecting cases).

Plaintiff's felony in eluding a police officer while endangering others "dovetails with the third *Graham* factor, 'whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" *Clark*, 675 Fed. Appx. at 807 (*citing Henry v. Storey*, 658 F.3d 1235, 1239-1240 (10th Cir. 2011) (noting that "[a] person who steals a vehicle non-violently still has the incentive and capability to evade arrest by fleeing in the vehicle" and for that reason rejecting the position that "officers may aim weapons at the occupants of a reportedly stolen vehicle only when they have reason to believe the vehicle

was stolen by force or violence."). Here, Plaintiff was clearly attempting to evade arrest by flight, a reasonableness factor weighing in favor of Defendants.

The second factor—the immediacy of the harm—requires the closest analysis and "is undoubtedly the 'most important' and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1216 (10th Cir. 2017) (*quoting Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). This factor is analyzed "at the precise moment that the officer used force[,]" *Estate of Ronquillo by and through Estate of Sanchez v. City and County of Denver*, 720 Fed. Appx. 434, 438 (10th Cir. 2017) taking into account "the totality of circumstances" of the entire scene, *Thomson*, 584 F.3d at 1319; *see also Estate of Ronquillo by and through Estate of Sanchez v. City and County of Denver*, 2016 WL 10843787, at *3 (D. Colo. Nov. 17, 2016) ("The court conducts this analysis from the perspective of a reasonable officer on the scene, rather than with the vision of 20/20 hindsight, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances.").

The events leading up to the precise moment in this case reflect that, over five minutes of a high-speed chase, law enforcement officers attempted at least two TVIs, and Plaintiff's SUV then collided with a fence, with Gray's rear bumper, and one citizen's parked vehicle. After hitting the parked vehicle, Plaintiff immediately placed his vehicle in reverse, hitting Wilson's vehicle as he backed up the SUV before attempting to continue moving forward. Trooper Wilson ran up and opened the driver's side left door, gun drawn, and instructed Plaintiff to get out of the vehicle, but Plaintiff continued to drive forward. The video footage reflects that shortly after Wilson ran up on the driver's side of the SUV,

Gray approached the vehicle from the rear passenger side and made his way to the front of the SUV.  McKee came from the same side shortly thereafter and remained by the front passenger side.  Only as Plaintiff's vehicle continued to move forward do both Gray and McKee start firing.  In sum, officers attempted to stop Plaintiff with sirens, multiple TVIs, and verbal commands while the driver's side door was open in the minutes leading up to the shooting, and he ignored them all, colliding with multiple law enforcement vehicles and private property including a fence and a parked vehicle.  Such documented noncompliance bolsters the immediacy of the threat to the officers, as "intoxicated people are often unpredictable and inject uncertainty into interaction with law enforcement." *Ornelas v. Lovewell*, 2014 WL 1238014, at *2 (D. Kan. March 26, 2014).  The immediacy of the harm was thus apparent in light of the damage already done, and "[t]he situation presented to [the officers] was clearly a tense, uncertain, and rapidly evolving situation that we do not like to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers."  *Phillips v. James*, 422 F.3d 1075, 1084 (10th Cir. 2005).  All three *Graham* factors therefore weigh in favor of Defendants Gray and McKee.

Force was clearly justified here.  The remaining question, then, is whether *deadly* force was justified.  "[T]he term [deadly force] encompasses a range of applications of force, some more certain to cause death than others. It includes force that is 'likely' to cause serious injury or death, such as ramming, and also includes force that is nearly certain to cause death, such as a shot to the head." *Cordova v. Aragon*, 569 F.3d 1183, 1189 (10th Cir. 2009).  "The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on

whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020) (quotation omitted).

The Tenth Circuit has identified additional factors for assessing the degree of threat the suspect poses to the officer, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260. "'These four factors and the three factors set forth in *Graham* cannot be applied mechanically, the district court 'must still slosh our way through the factbound morass of reasonableness[.]' '[I]f threatened by [a] weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force.'" *Ortiz*, 426 F. Supp. 3d at 934 (*quoting Scott v. Harris*, 550 U.S. 372, 383, (2007) and *Thomas*, 607 F.3d at 664). As with the *Graham* factors, the *Larsen* factors also weigh in favor of Defendants. The facts as revealed by the video footage demonstrate that officers repeatedly attempted to stop Plaintiff and ordered him to comply using, *inter alia*, sirens, TVIs, and verbal commands (first factor), but that he continued forward with his SUV regardless of officer instructions (second factor). Three officers were surrounding his vehicle, within feet or inches (third factor), and Plaintiff gave every indication that he did not intend to stop (fourth factor).

Deadly force is explicitly permitted when an individual is using a vehicle to attempt to run over an officer, *Clark*, 675 Fed. Appx. at 806 ("Notably, 'if threatened by

weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force.'") (*quoting Thomas*, 607 F.3d at 664); *see also Reavis*, 967 F.3d at 986 (same), and an officer may shoot "until the threat has ended." *Angilau v. United States*, 2018 WL 1278393, at *4 (D. Utah March 9, 2018) (*citing Plumhoff*, 572 U.S. at 777 ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."). Here, officers had clearly been repeatedly threatened with, and physically impacted by, Plaintiff's SUV.

The Supreme Court previously held that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott*, 550 U.S. at 386. The Court affirmed that holding in *Plumhoff*. 572 U.S. at 776. There, the Court found the use of deadly force was reasonable to end a grave public safety risk where:

> [T]he chase in this case exceeded 100 miles per hour and lasted over five minutes. During that chase, Rickard passed more than two dozen other vehicles, several of which were forced to alter course. Rickard's outrageously reckless driving posed a grave public safety risk. And while it is true that Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, Rickard resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse "in an attempt to escape." Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting. Under the circumstances at the moment when the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do

so, he would once again pose a deadly threat for others on the road. Rickard's conduct even after the shots were fired—as noted, he managed to drive away despite the efforts of the police to block his path—underscores the point. . . . [D]uring the 10–second span when all the shots were fired, Rickard never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened.

*Id.*, at 776-777.  The Court thus found deadly force reasonable when "the officers here shot at Rickard to put an end to what had already been a lengthy, high-speed pursuit that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby." *Plumhoff*, 572 U.S. at 780.  Plaintiff attempts to distinguish *Plumhoff* in two ways:  (i) asserting that Gray was not standing directly in front of his SUV when he began shooting but was already out of the direct line of the vehicle, *see Simpson v. Little*, 16 F.4th 1353, 1365 (10th Cir. 2021) ("In both *Carabajal* [*v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1206, 1209-1210 (10th Cir. 2017)] and *Clark* [*v. Bowcutt*, 675 Fed. Appx. at 800-801, 804] we determined that the defendant officers' use of force was reasonable because the officers were directly in front of an approaching vehicle when they fired on the drivers."), and (ii) contending that he was not trying to accelerate at a high rate of speed but rather was "going very slow and may have slightly accelerated after the officers starting shooting."   Neither of these contentions contradict the justification for deadly force in this case.  Whether Gray was standing directly in front of the SUV when he started firing is a disputed fact not clearly resolved by the video footage. *See* Docket No. 48, Ex. 5, 5:16-5:28; Ex. 6, 7:09-7:18; Docket No. 49, Ex. 9, Bates 267,

9:44-9:51; Bates 268, 5:59-6:06; Bates 269, 9:54-10:01; Bates 269A, 7:14-722.   Even taking into account Plaintiff's version, Gray made his way from the passenger side of the SUV to the driver's side, and had to step to move out of the way of the SUV's trajectory. If not directly in front of the SUV when he began firing, he was standing within inches of the SUV's front bumper on the driver's side, he fired his weapon at Plaintiff while Plaintiff's SUV was moving forward in or just beside his location, and he stopped firing at the approximate moment he was even with the driver's side window as the SUV kept moving forward.

While the Tenth Circuit has found officers reasonably perceived a threat when an officer is standing directly in front of a vehicle, both the Tenth Circuit and the Supreme Court have *also* upheld the use of deadly force where officers open fire on a vehicle accelerating forward toward multiple officers (as is applicable for McKee, who was standing on the passenger side and saw the SUV advancing toward Gray), *see Estate of Ronquillo*, 720 Fed. Appx. 438-440 (concluding the officers reasonably perceived a threat of imminent harm when they opened fire on a vehicle that accelerated forward toward multiple officers), and when an officer has to step to avoid a vehicle's flight (as applicable to Gray even if he was not standing directly in front of the vehicle at the time he began shooting), *see Ortiz*, 426 F. Supp. 3d at 937 ("In *Plumhoff* one officer was close enough to Rickard's vehicle that he pounded his gun on the window as Rickard floored the accelerator, and another officer had to step to avoid Rickard's vehicle once he regained flight.) (*citing Plumhoff*, 572 U.S. at 769-770); *see also Reavis*, 967 F.3d at 992 ("[O]ur decisions have held that an officer's use of deadly force is objectively reasonable when

the officer shoots at a vehicle coming directly toward the officer *or toward other persons*.") (emphasis added) (*citing Carabajal*, 847 F.3d at 1206; *Thomas*, 607 F.3d at 661, 664–66); *Navarro*, 2018 WL 4148452, at *9 ("Here, as in *Plumhoff*, it would be different if the first round had *clearly* incapacitated the suspect or if he had *clearly* given himself up. But that is not what happened in either case.") (emphasis in original).  And again, as to McKee, an officer may "shoot until the threat has ended."  *Angilau*, 2018 WL 1278393, at *4 (*citing Plumhoff*, 572 U.S. at 777 ("It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

Based on the totality of the circumstances here, the undersigned Magistrate Judge finds, as in *Plumhoff*, that "it is beyond serious dispute that [Schoggins's] flight posed a grave public safety risk, and here, as in *Scott,* the police acted reasonably in using deadly force to end that risk."  572 U.S. at 777; *see also Ortiz*, 426 F. Supp. 3d at 940 ("It bears noting that in the context of excessive force cases involving car chases, the Supreme Court has 'never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity' where an officer reasonably believed he or others were in danger.'" (*quoting Johnson v. Peay*, 704 Fed. Appx. 738, 743 (10th Cir. 2017) (quoting *Mullenix*, 577 U.S. at 14-15). This finding applies to Gray and McKee both individually and collectively,  *see Navarro*, 2018 WL 4148452, at *10 ("[W]ith the totality of the factual circumstances in mind, the *Estate of Larsen* factors—viewed alongside the variables that *Graham* specifically identifies—powerfully support the officers' position that their use of deadly force was

reasonable in this case."), and is in line with the Tenth Circuit's holding that "when an officer uses deadly force to stop a fleeing vehicle, he must do so based on an immediate threat to himself or a threat to others," *Reavis*, 967 F.3d at 994. Because the totality of the circumstances justified the use of force by Gray and McKee, the undersigned Magistrate Judge finds no violation of a constitutional right.

**Clearly Established Law.** Even assuming *arguendo* that the officers' actions were objectively unreasonable, the Plaintiff must also establish that Defendants' actions violated a clearly established constitutional right. "Ordinarily, a plaintiff may show that a particular right was clearly established at the time of the challenged conduct by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as he maintains." *A.M. v. Holmes*, 830 F.3d 1123, 1135 (10th Cir. 2016) (quotation omitted). However, "'clearly established law' should not be defined 'at a high level of generality.'" *Pauly*, 580 U.S. at 79 (*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, it "must be 'particularized' to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (*quoting Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987)). Therefore, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (emphasis in original) (quotation omitted).

Defendants contend that *Plumhoff* supports a finding that they committed no violation of any clearly established law. And Plaintiff has pointed the Court to no law on

this issue, instead agreeing with Defendant that *Plumhoff* could apply but asserting that his excessive force claim is too "fact intensive" and should therefore be put to a jury. But the issue of clearly established law is not a jury question and Plaintiff has not pointed the Court to any case in support of his arguments. *See Plumhoff*, 572 U.S. at 780 ("Yet respondent has not pointed us to any case—let alone a controlling case or a robust consensus of cases—decided between 1999 and 2004 that could be said to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase."). Furthermore, the Tenth Circuit stated, "[i]t is clearly established that an officer may use deadly force when 'threatened by a weapon (which may include a vehicle attempting to run over an officer),'" *Reavis*, 967 F.3d at 992 (*quoting Thomas*, 607 F.3d at 664), but that he may only "do so based on an immediate threat to himself or a threat to others." *Id.*, at 994. The undersigned Magistrate Judge agrees that, after *Plumhoff*, Defendants have violated no clearly established law. *See, e.g.*, *Ortiz*, 426 F. Supp. 3d at 940 ("The Supreme Court's 2014 decision in *Plumhoff v. Rickard* establishes that as of November 2017, the date of the events in question, it was not clearly established that an officer must refrain from using deadly force to terminate a dangerous chase where the driver continues to push down on the car's accelerator even though the car may have come to a temporary stop.").

The undersigned Magistrate Judge thus concludes that Defendants did not violate Plaintiff's clearly established Constitutional rights. Because Plaintiff fails to carry his burden of establishing a violation of his constitutional rights, and because the law is not clearly established that the Defendants' actions violated the law, Defendants Gray and McKee should be granted qualified immunity on Plaintiff's claim under 42 U.S.C. § 1983.

## B.  Supplemental Jurisdiction

Having recommended dismissal of Plaintiff's § 1983 claim as to Gray and McKee, and considering Plaintiff's abandonment of his § 1983 claims as to OHP and McAlester, the only remaining claims before the Court are Oklahoma state law claims.  Under 28 U.S.C.A. § 1367, "district courts may decline to exercise supplemental jurisdiction over a claim" if, *inter alia*, "the district court has dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  In other words, "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."  *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998).  "Specifically, the Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction not as a litigant's right, but as a matter of judicial discretion."  *Denney v. Bd. of Cnty. Commissioners of Love Cnty.*, 2016 WL 7168071, at *2 (E.D. Okla. Dec. 8, 2016) (*citing Estate of Harshman v. Jackson Hole Mountain Resort Corp.,* 379 F.3d 1161, 1165 (10th Cir. 2004) (*citing City of Chi. v. Int'l Coll. of Surgeons,* 522 U.S. 156, 173 (1997), *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966)).  As "a doctrine of discretion, not of plaintiff's right," the justification for supplemental jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants."  *Gibbs*, 383 U.S. at 726.  The statute provides four factors for consideration in whether to retain supplemental jurisdiction:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Tenth Circuit has "repeatedly recognized that [declining supplemental jurisdiction] is the preferred practice." *Gaston v. Ploeger*, 297 Fed. Appx. 738, 746 (10th Cir. 2008); *see also Smith*, 149 F.3d at 1156 ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."). "The Supreme Court made clear in *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 7 (1988), however, that *Gibbs* did not create an inflexible rule *mandating* dismissal." *Parker v. Town of Chelsea*, 620 F. Supp. 2d 1266, 1270 (N.D. Okla. 2008) (emphasis added); *see also Thatcher Enterprises v. Cache County Corp.*, 912 F.2d 1472, 1478 (10th Cir. 1990) ("The district court has discretion to try state claims in the absence of any triable federal claims; however, that discretion should be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction."). Indeed, the Court must weigh "the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie-Mellon*, 484 U.S. at 350.

This case is not in the early stages of litigation; it has been pending for two years. And while the undersigned Magistrate Judge recommends dismissal prior to trial, the parties have completed discovery, the pretrial conference is set for next month, and the areas of law are not novel to the Court. Moreover, McAlester as Defendant in this case requests the Court retain jurisdiction. Furthermore, the Court may retain jurisdiction "if

substantial time and energy have been expended on the case prior to disposition of the federal claims. . . . [and where the Complaint] does not pose novel or unsettled questions of state law." *Jones v. Intermountain Power Project*, 794 F.2d 546, 550 (10th Cir. 1986), *abrogated on other grounds in Yellow Freight System, Inc. v. Donnelly*, 494 U.S. 820 (1990). Indeed, Plaintiff's state law claim premised on excessive use of force as to OHP involves several factors identical with and relevant to the analysis of his § 1983 claim as to OHP Troopers Gray and McKee. *See People's Legislature v. Miller*, 2012 WL 1119239, at *3-4 (D. Nev. April 3, 2012) (retaining federal and state law claims that did arise from same operative facts and were therefore within the court's supplemental jurisdiction) (*cited with favor in Bivens v. Glanz*, 2012 WL 3136115, at *2 (N.D. Okla. Aug. 1, 2012); *see also Brown v. K-MAC Enterprises*, 897 F. Supp. 2d 1098, 1102 (N.D. Okla. 2012) (severing and remanding worker's compensation claim, but retaining state *Burk* tort claim and IIED claim as part of same case and controversy as federal Title VII, ADA, ADEA, and FMLA claims). Accordingly, the undersigned Magistrate Judge recommends retaining jurisdiction considering the nature of the claims remaining and their relationship to the federal claim, as well as the time already expended upon this case. As such, the undersigned Magistrate Judge proceeds on the merits of Plaintiff's state law claims as to OHP and McAlester.

### C. OGTCA Negligence-Based Claim as to OHP

The undersigned Magistrate Judge next finds OHP is entitled to summary judgment on Plaintiff's state law claim against it. Plaintiff alleges a state law negligence claim as

to OHP premised on Gray and McKee's alleged use of excessive force.[6]  "Section 153 of

the OGTCA provides that a municipality is liable for loss resulting from the torts of its

employees acting within the scope of their employment." *Lawrence v. City of Owasso*,

2014 WL 693443, at *4 (N.D. Okla. Feb. 21, 2014) (*citing* 51 Okla. Stat. § 153(A));

*Osterhout v. Timms*, 2018 WL 1915931, at *6 (E.D. Okla. Apr. 23, 2018) ("Unlike § 1983,

the doctrine of *respondeat superior* is applicable under the OGTCA.").  To succeed on his

claims against OHP, Plaintiff must show the officers were negligent in the use of excessive

force.  "The [O]GTCA defines a 'tort' as a legal wrong involving a violation of a duty

imposed by general law or otherwise resulting in a loss as the proximate result of an act

or omission of a political subdivision or employee acting within the scope of employment.

'Scope of employment' is defined as performance by an employee acting in good faith

within the duties of his office or employment or of tasks lawfully assigned by a competent

authority." *Tuffy's, Inc. v. City of Oklahoma City*, 2009 OK 4, ¶ 8, 212 P.3d 1158, 1163;

*see also Nail v. City of Henryetta*, 1996 OK 12, ¶ 11, 911 P.2d 914, 917 ("Oklahoma law

---

[6] It is not clear from Plaintiff's Complaint that he has properly alleged this claim, *see supra* n. 2, and OHP's motion for summary judgment likewise stated the parties were unclear on the nature of the claim, *see* Docket No. 49, p. 29.  While Plaintiff's Response indicates he is asserting a claim for excessive force under *Bosh*, the Oklahoma Constitution, and the OGTCA, the Oklahoma Supreme Court assumed a state-based negligence claim for allegations of excessive force in 2010, meaning *Bosh*, decided in 2013, is inapplicable here. *See Perry v. City of Norman*, 2014 OK 119, ¶ 19, 341 P.3d 689, 693 ("Because the plaintiff could have brought a claim for excessive force against the City under the OGTCA and potentially recovered for that claim, he was not left without a remedy. There is no rationale requiring the extension of a *Bosh* excessive force action brought under the Okla. Const. Art. 2, § 30 to this cause."); *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dept.*, 2010 OK 9, ¶ 21, 230 P.3d 869, 878 ("[W]e will assume for purposes of this decision, without deciding, that a police officer owes a negligence-based duty of care to an arrestee to protect the arrestee from injury.").  Nonetheless, rather than dismiss the claim outright, the undersigned Magistrate Judge will proceed on the merits.

recognizes the applicability of the doctrine of respondeat superior to the Governmental Tort Claims Act. Under the theory of respondeat superior, one acts within the scope of employment if engaged in work assigned, or if doing that which is proper, necessary and usual to accomplish the work assigned, or doing that which is customary within the particular trade or business."). The parties do not dispute that Gray and McKee were acting within the scope of their employment.

The Oklahoma Supreme Court has assumed, without deciding, "that a police officer owes a negligence-based duty of care to an arrestee to protect the arrestee from injury." *Morales*, 2010 OK 9, ¶ 21, 230 P.3d at 878. While "a police officer has a special dispensation from the duty of ordinary care not to endanger others," *Morales*, 2010 OK 9, ¶ 26, n. 48, 230 P.3d at 880, he or she may "**use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest.**" *Id.* (emphasis in original); *see also Perry*, 2014 OK 119, ¶ 19, 341 P.3d at 693 ("[E]mployer liability for police officer's alleged excessive force conduct under the OGTCA is well settled.").

OHP contends it is immune from liability under the OGTCA based on a number of exceptions, including 51 Okla. Stat. §§ 155(4) ("Adoption or enforcement of or failure to adopt or enforce a law, whether valid or invalid, including, but not limited to, any statute, charter provision, ordinance, resolution, rule, regulation or written policy[;]"), (5) ("Performance of or the failure to exercise or perform any act or service which is in the discretion of the state or political subdivision or its employees;"), (6) ("Civil disobedience, riot, insurrection or rebellion or the failure to provide, or the method of

providing, police, law enforcement or fire protection;"), and (30) ("Acts or omissions done in conformance with then current recognized standards[.]"). Courts have previously recognized, however, that "Section 155(6) does not provide municipalities with *a priori* immunity where a plaintiff seeks recovery for allegedly tortious acts of law enforcement personnel in the use of force to effect an arrest." *Lawrence*, 2014 WL 693443, at *3 (*citing Morales*, 2010 OK 9, ¶¶ 14-15, 230 P.3d at 876). "The Oklahoma Supreme Court has held that 'protection' is the operative word, and that immunity therefore attaches under § 155(6) when police are providing 'protection' as opposed to carrying out a 'law enforcement function.'" *Samuel v. City of Broken Arrow, Okla.*, 506 Fed. Appx. 751, 755-756 (10th Cir. 2012) ("[A]n officer is not engaged in a protective function where he carries out an arrest as part of his general 'law enforcement activities.'") (*Morales*, 2010 OK 9, ¶ 15, 230 P.3d at 876 and *Salazar v. City of Okla. City*, 1999 OK 20, ¶ 27, 976 P.2d 1056, 1066 (italicization omitted)). In short, "[n]egligent performance of a law enforcement function is not shielded from immunity under the GTCA." *State ex rel. Oklahoma Dep't of Pub. Safety v. Gurich*, 2010 OK 56, ¶ 10, 238 P.3d 1, 4.

For state law tort excessive force claims, Oklahoma uses the same "objective reasonableness" standard of care as is used for federal excessive force claims. *See Morales*, 2010 OK 9, ¶ 26, 230 P.3d at 880 ("In applying this standard, an officer's subjective mistake of fact or law is irrelevant, including whether he (she) is acting in good faith or bad. The question is whether the objective facts support the degree of force employed.") (emphasis in original). *See also Osterhout*, 2018 WL 1915931, at *6 ("[T]he Oklahoma Supreme Court has adopted an 'objective reasonableness standard applicable

to police use of force' that uses the 'totality-of-the circumstances' approach 'like that

employed by the United States Supreme Court in § 1983 civil rights claims.'") (*citing*

*Morales*, 2010 OK 9, ¶¶ 26-27 & nn.47-48, 230 P.3d at 880 & nn.47-48).

> Among the factors that may be considered in evaluating the objective
> reasonableness of an officer's use of force in making an arrest are: (1) the
> severity of the crime of which the arrestee is suspected; (2) whether the
> suspect poses an immediate threat to the safety of the officers or others,
> (3) whether the suspect is actively resisting arrest or attempting to evade
> arrest; (4) the known character of the arrestee; (5) the existence of alternative
> methods of accomplishing the arrest; (6) the physical size, strength and
> weaponry of the officers compared to those of the suspect; and (7) the
> exigency of the moment.

*Morales*, 2010 OK 9, ¶ 27, n. 48, 230 P.3d at 880 (*citing Graham*, 490 U.S. at 396 and

*Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977)). "The standard of care takes

into account that making an arrest often involves a risk of harm to the person being

arrested, and the use of minimal force will not subject a police officer to civil liability."

*Morris v. City of Tulsa*, 2020 WL 4352737, at *11 (N.D. Okla. July 29, 2020) (*citing*

*Morales*, 2010 OK 9, ¶¶ 25-26, 230 P.3d at 880).

The first three factors are drawn from *Graham* and discussed by the undersigned

Magistrate Judge *supra*. *See Cantrell v. Johnson*, 2017 WL 5503716, at *7 (E.D. Okla.

Nov. 16, 2017) ("[T]he Court concludes as a matter of law that Deputy Johnson's use of

force against Mr. Lyons was objectively reasonable, for the reasons explained above with

respect to Plaintiff's § 1983 claim."). The fourth factor (knowledge about the arrestee) is

neutral in this case. While officers were given Plaintiff's name during the chase, there is

no evidence here that any OHP officer had any prior encounters with him. The fifth factor

(alternative methods) weighs in favor of OHP. Here, Plaintiff failed to stop when

approached by law enforcement vehicles with sirens on, had two direct TVIs and several collisions with officers *before* they got out of their vehicles, and was given verbal commands with the driver's side door open.  Only after all that failed to stop Plaintiff did Gray and McKee began shooting as Plaintiff continued to attempt evasion.  Multiple alternative methods were used and Plaintiff repeatedly ignored and countered them all.  The sixth factor (physical size and weaponry of participants) slightly weighs in OHP's favor.  While Plaintiff's physical size is irrelevant, he was using his SUV as a weapon, endangering the lives of both officers and other citizens on the highways and in the neighborhood where he was ultimately stopped.  At the moment of the shooting, he was surrounded on three sides by officers with guns.  While there is no evidence Plaintiff had a gun, it was clear that he was using his SUV as a weapon.  Finally, the seventh factor (exigency of the moment) is in favor of OHP.  The evidence is clear that, after a five-minute high-speed chase littered with collisions and property damage, at the time Gray and McKee fired their weapons, officers had an imminent need to confront and stop Plaintiff and that his conduct had created a risk of harm to both officers and citizens with no indication that the danger had abated or would abate without intervention.

In sum, a majority of the seven factors favor OHP and the rest are neutral. *Lynch v. Bd. of Cnty. Commissioners of Muskogee Cnty., Oklahoma, ex rel. Muskogee Cnty. Sheriff's Dept.*, 2018 WL 1417166, at *10 (E.D. Okla. Mar. 21, 2018) ("In consideration of all these factors, the actions of Defendant's police officers were still objectively reasonable for the same reasons set forth above. Throughout the event, all law enforcement officers used reasonable methods to attempt to restrain Decedent. They acted pursuant to

-31-

law enforcement policy, state and federal law with regard to attempting to secure Decedent after he had been involved in a drunk driving accident, assaulted an officer, and continued to resist their commands. Decedent's death, while tragic, was not caused by any of the Defendants. The situation was rapidly evolving, Decedent was actively resisting and unrestrained, and Defendant's police officers took the necessary measures to defuse the situation"), *aff'd sub nom. Lynch v. Bd. of Cnty. Commissioners of Muskogee Cnty., Oklahoma*, 786 Fed. Appx. 774 (10th Cir. 2019).   Accordingly, the undersigned Magistrate Judge finds, as with Plaintiff's § 1983 claim, that the officers' actions were reasonable considering the objective circumstances confronting them and recommends OHP be granted summary judgment on Plaintiff's Oklahoma state law negligence claim premised on law enforcement officers' alleged use of excessive force.

### D. OGTCA Negligence-Based Claim as to McAlester

The undersigned Magistrate Judge now turns to McAlester's motion for summary judgment.   Plaintiff alleges a state law negligence claim as to McAlester.[7]   McAlester contends that there is no causal connection between MPD Officer Sutterfield's actions and Plaintiff's death, that Plaintiff's death was not foreseeable, and, alternatively, that OHP Trooper actions are sufficient supervening cause to break any causal connection. Furthermore, McAlester contends that Sutterfield breached no duty to Plaintiff as he was authorized to make a traffic stop and individuals have a duty to submit to traffic stops under Oklahoma law.   In response, Plaintiff asserts without support that Sutterfield's

---

[7] The undersigned Magistrate Judge again notes Plaintiff's claims as to McAlester are unclear, *see supra* n. 2, but proceeds on the merits as agreed by the parties.

decision to "embark on a high-speed pursuit for a misdemeanor . . . was obviously erroneous."  Docket No. 54, p.3.  Additionally, Plaintiff contends that there was no intervening cause.  Although he acknowledges that the shooting may not have been foreseeable, he asserts that injury and death is foreseeable for any high-speed chase, and that the combination of actions of OHP Troopers and Sutterfield is sufficient causal connection.

"There are three elements to a claim for negligence: 1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care."  *Smith v. City of Stillwater*, 2014 OK 42, ¶ 22, 328 P.3d 1192, 1200 (*citing Berman v. Laboratory Corp. of America,* 2011 OK 106, ¶ 16, 268 P.3d 68, 72; *Smith v. Hines,* 2011 OK 51, ¶ 12, 261 P.3d 1129, 1133).  "[I]f the defendant did not owe a duty of care to the plaintiff, there can be no liability for negligence as a matter of law."  *Lowery v. Echostar Satellite Corp.*, 2007 OK 38, ¶ 12, 160 P.3d 959, 964.  As McAlester points out, it is well-settled under Oklahoma law that "law enforcement officers owe no duty to a fleeing suspect, statutorily created or otherwise."  *Smith*, 2014 OK 42, ¶ 36, 328 P.3d at 1204.  Indeed, "[e]very motorist in the state of Oklahoma has an affirmative duty to stop their vehicle when directed to do so by a law enforcement officer. By fleeing from law enforcement, it is the suspect who's unlawful and dangerous actions necessitate pursuit in the first place."  *Id.*, ¶ 34, 328 P.3d at 1204.  Accordingly, McAlester owed no duty to support a claim for negligence, and the undersigned Magistrate Judge

finds that McAlester is entitled to summary judgment on Plaintiff's OGTA negligence claim against it.

## CONCLUSION

Accordingly, the undersigned Magistrate Judge hereby RECOMMENDS that Defendants OHP, Garret Gray and James McKee's Motion for Summary Judgment [Docket No. 49] and Defendant City of McAlester's Motion for Summary Judgment and Brief in Support [Docket No. 48] be GRANTED.  Defendant City of McAlester's Motion to Dismiss & Brief in Support [Docket No. 11] should be deemed MOOT considering the recommendations above and Plaintiff's abandonment of two of his three claims against McAlester.  Any objections to this Report and Recommendation must be filed within fourteen days.  *See* 18 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Any objections and response shall each be limited to 10 pages and a reply is permitted only with leave of court upon a showing of good cause.

DATED this 12th day of April, 2023.

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**